## COBB v. HOWARD UNIVERSITY.

### No. 7315.

United States Court of Appeals for the District of Columbia.

Decided July 10, 1939.

Geo. D. Horning, Jr., Wm. E. Leahy, and Geo. A. Parker, all of Washington, D. C., for appellant.

Spencer Gordon, of Washington, D. C., for appellee.

Before EDGERTON, VINSON, and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

This suit was brought by appellant, Cobb, for a mandatory injunction which, so far as it can be effective now, would direct appellee, Howard University, to reinstate him as a part-time professor of law and accord him permanent tenure as such. The case comes here on appeal from a final judgment below dismissing the bill after hearing on the merits. The parties will be referred to in this opinion according to their respective positions in the trial court.

Plaintiff was a part-time teacher in defendant's law school from 1917 to June 30, 1938.[1] He was also vice-dean of the

---

[1] There were frequent changes, by mutual agreement, in plaintiff's teaching load, salary and subjects taught. His teaching schedule was one hour per week until 1922, and thereafter varied from two to four hours per week. His salary ranged from $250 per annum the first year to $1,700 per annum during 1933–34. From 1934 to 1938 he received $1,100 per annum. His salary as judge of the Municipal Court was $8,000 per annum.

school from 1923 to 1931. During the entire period of his connection with defendant, he has practiced law as his principal occupation and source of livelihood, except from 1926 to 1935 when he was a judge of the Municipal Court. His original appointment was as "lecturer on negotiable instruments for one year" at a salary of $250. He claims, and testified to the fact, that it was made on oral assurances by the then dean of the school and other officials of defendant that his first year of service would be on probation after which, if the service was satisfactory, his employment would be indefinite in tenure. Plaintiff was retained during the following year and succeeding ones, with duties and compensations which were changed from time to time. He asserts and testified that during his second year he was notified verbally by the dean and by the secretary that he was appointed for an indefinite tenure, his work having been satisfactory.

Various formal actions were taken by defendant's Board of Trustees from 1917 to 1931 relating to his work and status as teacher or professor of law, but only on occasions when some change, such as an increase in salary, was involved. During this period there is no entry in the corporate records of any action of the Board or of any of its committees appointing or reappointing plaintiff annually as a teacher.[2] During the period from 1917 to 1930 or 1931, the defendant's law school was a part-time evening school and the officers and teachers were part-time officials, principally practicing lawyers and judges. Plaintiff was thus a typical member of the law faculty during this period.

Beginning about 1930 (perhaps a year earlier), the law school was reorganized radically by conversion into a full-time day school with full-time teachers as the principal staff, although plaintiff and one other were retained from the previous faculty as two of four part-time teachers. As a part of the reorganization, the Board of Trustees adopted a resolution, in 1929 or 1930, placing the entire faculty and administrative staff of the law school on year-to-year tenure. Apparently notice of this general resolution was not communicated to the faculty; but on June 27, 1931, the Executive Committee of the Board adopted a resolution making all appointments to the law faculty for 1931-1932 to be "for the duration of one year", including that of plaintiff as a part-time teacher with the rank of professor at a salary of $1,600. Except in respect to tenure, there was no attempt at this time to change any term of plaintiff's contract. Plaintiff was notified formally of this action by a letter from the secretary of defendant dated June 30, 1931.[3] After some colloquy with various officials of defendant, including the secretary, the acting dean of the law school and Mr. Crawford, a trustee and chairman of the law school committee of the Board, the defendant wrote a letter under date of July 14, 1931, to the secretary, in reply to his letter of June 30, "accepting reappointment".[4]

---

[2] Entries do appear in the Board's minutes for 1923 appointing him as vice-dean of the law school, and for the years 1924 and 1925 reappointing him as such. There are no similar entries from 1925 to 1930.

[3] The letter was as follows:
"Dear Judge Cobb:
"The Board of Trustees at its meeting held April 14, 1931, delegated the Trustee Committee on the School of Law, full authority in the matter of appointments to the Howard University School of Law Faculty and Administrative Staff for the school year 1931–1932.
"I write to officially convey to you the following vote of the Law School Committee of the Board of Trustees of Howard University, at its meeting held Saturday, June 28, 1931.
"*Extract from Minutes*
"'Voted, that James A. Cobb be reappointed as Professor, part-time, in the school of law, Howard University, for the school year 1931-1932, at a salary of $1600 for the year.'
"It gives me great pleasure to convey to you on behalf of the President and the members of the Law School Committee of the Board of Trustees, this renewed expression of confidence.
"I will very much appreciate acknowledgment of this communication at your convenience, so that your reply may be filed with the records of the Board of Trustees.
    "Attest:
        "Emmett J. Scott,
            "Secretary-Treasurer."

[4] The letter was as follows:
"Dear Doctor Scott:
"I am duly in receipt of your letter of June 30th informing me of my re-appointment as Professor in the School of Law, part time, for the year 1931–1932, at a salary of $1600 for the year. In ac-

From 1931 to 1938, resolutions were adopted annually by the Board "reappointing" plaintiff as "Professor of Law for one year", all except that for 1932 stating the appointment would "expire automatically on June 30" of the following year. In each of these years, except 1936, plaintiff was duly notified in writing of the action taken by the Board. He did not reply in writing to these letters, but protested orally on many occasions to various officials of defendant and by letter dated September 14, 1937, addressed to the acting dean of the law school, against the attempt so to limit his tenure, asserting a contract right to tenure during good behavior extending back to 1923. Without going into further detail, the evidence shows clearly that from 1931 on defendant maintained, so far as its formal records and written notices go,[5] that plaintiff was on tenure from year to year, and plaintiff, except for his letter of July 14, 1931, consistently maintained that his contract with the university was for tenure during good behavior.

On March 23, 1938, plaintiff was called by telephone from the office of Senator Carter Glass to appear before a subcommittee of the Senate Committee on Appropriations to testify in connection with its consideration of the appropriation bill for the university, and made before the Committee the statement set out in the margin.[6] On April 12, following, defendant's Board of Trustees adopted the following resolution:

"Upon motion, it was voted that Judge Cobb be not reappointed and that his services terminate as of June 30, 1938, with an explanation to Judge Cobb that because of his action in appearing before a congressional committee in opposition to University Appropriations, his services are terminated." [7]

Plaintiff was duly notified of this action, protested in person and by attorney, and receiving no reply, instituted this suit on May 27, 1938. He continued to teach until June 30, 1938, and has not been permitted to do so thereafter.

On April 28, 1933, defendant's Board of Trustees formally adopted a statement of "Policy Concerning Tenure", which we do not regard as applicable to plaintiff.[8]

Plaintiff's basic claim is that prior to 1931 he acquired rank under contract with

---

cepting re-appointment, this being my 16th year of service in the Law School, I wish to thank you for conveying the above information and through you to thank the Board of Trustees and the Law School Committee for their confidence in me which is manifested by their re-appointment and to assure you and them of my appreciation for the same.

> "Very sincerely yours,
> "James A. Cobb."

[5] There were, however, statements made orally to plaintiff by various officials of the university, including Mr. Crawford, chairman of the Board's committee on the law school, which were not entirely consistent with the resolutions.

[6] "Mr. Cobb. Mr. Chairman and gentlemen of the committee, I am a teacher and have been since 1917 in Howard University. I want to say, Mr. Chairman, that it is not a question of the size of the appropriation. We would appreciate it if we had more. The only question is about this $3,000 item. We have had a field agent, and had one for a number of years, and upon the recommendation of Mordecai Johnson, the president, that field agent was eliminated on the ground that we did not need him, and the salary was abolished.

"He comes back now and asks for $3,000 for a field agent. That field agent,

in the opinion of those who are closely connected and associated with the university, would be used to build up Mordecai Johnson and not be used for the development of Howard University. We feel that his services would be utilized to try to build up Mordecai Johnson, and we are firmly convinced that the item should be eliminated."

It should be added that the item was opposed also by Mr. Eugene Davidson, in his capacity as Secretary of the Alumni Association of the University.

[7] This action was taken upon a recommendation of the law school committee of the Board that plaintiff be "reappointed".

[8] The regulations contain some evidence of contractual intention upon their face, but they specifically provide that after a satisfactory probationary period a teacher "may *normally* expect further or permanent appointment" [italics supplied], thus reserving the right to withhold such appointment in individual cases. In our view, the annual resolutions of "reappointment" and the letters of notice thereof from 1931 forward were effective to prevent the tenure regulations from becoming applicable to plaintiff. This would be true, we believe, regardless of their effect or lack of it upon any contract for tenure made prior to 1931.

defendant as a full professor of law, though for only part-time service and pay, with tenure as such which is described variously as "indefinite", "without term", "during good behavior" and "permanent"; that this status remained unaltered by any subsequent occurrence; that the resolution of defendant's Board terminating his services and defendant's refusal, pursuant to it, to permit him to teach after June 30, 1938, are in violation of his rights under the contract; and that, having no plain, adequate and complete remedy at law, he is entitled to the equitable relief prayed in the bill. Some claim appears to be based also, though we think ineffectively,[9] upon the tenure regulations of 1933. Subordinate claims are based upon alleged removal without prior notice or hearing.

Defendant answered, hearing on the merits was had, and on October 25, 1938, the court made findings of fact and conclusions of law which sustained defendant's contentions fully on all issues. These, summarized, were to the effect that plaintiff's tenure was not at any time permanent, but was only from year to year; that his employment expired June 30, 1938; that he had no right to notice or hearing; that if, as contended, he acquired permanent tenure prior to 1931, he lost it in that year by accepting appointment on an annual basis; that defendant's tenure regulations of 1933 were not binding contractually upon it, or in any event applicable or applied to plaintiff; that, if plaintiff's contract had been for permanent tenure, his statements before the subcommittee of the Senate Committee on Appropriations constituted cause justifying his dismissal; and that the court could not decree "specific performance of a personal service contract of the kind alleged", or "order that plaintiff be allowed to teach certain subjects, certain hours each week, at a certain salary, when the details of the alleged contract of employment have been changed in those respects on numerous occasions." On the same day judgment was entered pursuant to these findings dismissing the bill.

Plaintiff contends that the court erred, not only in making the findings and conclusions summarized above and in rendering judgment thereon as stated, but also in excluding evidence tendered by him to show the existence, prior to 1931, of an established custom of the university giving permanent tenure to full professors and that this custom became a part of his contract with defendant.

We do not find it necessary to pass upon the validity of the trial court's rulings on many of the important and interesting issues involved in the case. We express no opinion as to whether there was error in the exclusion of the evidence tendered by plaintiff to show the existence of a general and established custom or practice of the defendant and its applicability to plaintiff. Nor do we determine the effect of his letter of July 14, 1931 upon relations existing previously between the parties, or indicate any opinion as to whether the appearance and statements of plaintiff before the Congressional committee constituted cause justifying removal. On another and controlling ground we think the plaintiff is not entitled to the only relief he seeks in this suit.

Howard University is a private corporation,[10] organized and existing under an Act of Congress[11] and acts amendatory thereto, which vest the government and management of its affairs in a Board of Trustees, give it power to appoint instructors and determine their salaries, and confer upon it the usual corporate powers of acquiring and holding property and of suing and being sued. Section 7 of the original act of incorporation provides:

"That the board of trustees shall have power to remove any professor or tutor or other officers connected with the institution, when, in their judgment, the interest of the university shall require it."

We think this provision precludes the plaintiff from having the relief he seeks in this proceeding. The law is clear that it became a part of any contract which may have existed between the plaintiff and the defendant.[12] Its effect remains to be determined.

There is authority for the view that such a provision as Section 7 incapacitates the corporation to make any contract with a teacher which is not terminable at the

---

[9] For the reason stated in the preceding note.

[10] Maiatico Construction Co. v. United States, 1935, 65 App.D.C. 62, 79 F.2d 418.

[11] March 2, 1867, 14 Stat. 438, 439.

[12] See the cases cited in notes 13 and 16, infra.

arbitrary will of the trustees or governing body.[13] In each of the cases cited there was a clear agreement either that the teacher's employment should be for a specified term which had not expired when he was discharged, or for what is in effect the same thing, namely, that notice should be given a specified time in advance of dismissal, which was not done. In none of the cases, with possibly a single exception, was there any showing of cause justifying dismissal prior to the end of the term. The view taken was that the statutory provision deprived the governing board of power to make a contract with a teacher for any definite term, however minute, and that attempts by it to do so were wholly nugatory in a legal sense.

Thus in Devol v. Board of Regents, 1899, 6 Ariz. 259, 56 P. 737, 738, the court said:

"They [the legislature] gave them [the Board of Regents] no power to fix times of notice for the discharge of employés. If the board could fix such time at three months, to bind themselves or their successors, they could fix it at six months, or nine months, or a year, which would be in direct violation of the interests of the institution as the legislature had created it."[14]

In Gillan v. Board of Regents of Normal Schools, 1894, 88 Wis. 7, 58 N.W. 1042, 1044, 24 L.R.A. 336, the court asserted:

"An emergency might arise when the continuance of an objectionable teacher, *even for a day,* in his employment, might be very injurious to the school." [Italics supplied] [15]

This interpretation, if the proper one, goes to the root of the plaintiff's case and in effect renders the university incapable of making a contract such as he claims existed and such as is essential to the giving of any relief.

On the other hand, there are decisions which give the statutory provision a less drastic effect. They take the view that, though the provision empowers the governing board to remove the instructor at any time, nevertheless it does not disable the board to contract effectively that it will not exercise the power arbitrarily or unreasonably, or, in other words, to make reasonable agreements for the tenure of teachers.[16] In Board of Regents v. Mudge, 1878, 21 Dass.Ed. 169, 21 Kan. 223, the court rejects the argument, under a statutory provision practically identical with the one before us, that "the board has no legal power to make a contract * * * for any particular period of time—not even for a day or an hour," saying:

"There is no express limitation upon the power of the board to make a contract to employ a president or a professor or a teacher for any period of time, and we know of no implied limitation that would

---

[13] Hyslop v. Board of Regents, 1913, 23 Idaho 341, 129 P. 1073; Devol v. Board of Regents, 1899, 6 Ariz. 259, 56 P. 737; Gillan v. Board of Regents of Normal Schools, 1894, 88 Wis. 7, 58 N. W. 1042, 24 L.R.A. 336; State ex rel. Hunsicker v. Board of Regents of Normal Schools, 1932, 209 Wis. 83, 244 N. W. 618; Ward v. Board of Regents, 1905, 8 Cir., 138 F. 372. Cf. People ex rel. Kelsey v. New York Post Graduate Medical School & Hospital, 1898, 29 App.Div. 244, 51 N.Y.S. 420. This view is said to go back to Queen v. Darlington School [1844], 6 Q.B. 682, which, however, was a proceeding in mandamus, not an action for damages. The court, in 6 Q.B. at page 715, specifically stated: "The governors would be guilty of misconduct, might perhaps render themselves liable to a criminal prosecution, if they exercised their discretion of removal in an oppressive manner, or from any corrupt or indirect motive." The instructor was regarded as an "officer".

The principle has been applied to a su-

perintendent of public schools [Farley v. Board of Education, 1917, 62 Okl. 181, 162 P. 797, where the statute prescribed holding office "during the pleasure of the board"], and the medical superintendent of a state hospital for insane persons [Smith v. Directors of Insane Asylum of New Mexico, 1914, 19 N.M. 137, 141 P. 608].

[14] 6 Ariz. 259, 56 Pac. at page 738.

[15] 88 Wis. 7, 58 N.W. at page 1044, 24 L.R.A. 336.

[16] Board of Regents v. Mudge, 1878, 21 Dass.Ed. 169, 21 Kan. 223; State Board of Agriculture v. Meyers, 1904, 20 Colo.App. 139, 77 P. 372; Board of Education v. Cook, 1896, 3 Kan.App. 269, 45 P. 119. In the case last cited, a regulation of the board, "unless sooner removed by vote of the board", rather than a statute, was held to enter into and become part of the contract for a year's employment, but not effective to deprive the board of power to make a contract for a fixed term.

prevent the board from employing, or agreeing to employ, a president or a professor or a teacher for three months, or for even a longer period of time, provided it were not unreasonably long. * * * It would certainly be for the interest of the college that the board should have such power. No man of spirit, of self-respect, and of capability, would want to hold an office or position at the whim or caprice of a body of men with whom he might have but little if any personal acquaintance * * * would accept an office unless he felt that he was reasonably certain to hold the same for some reasonable period of time. The shorter and more precarious the tenure of the office, the less attractive, important, and valuable it would be; and generally, men of only inferior talent could be found to accept it or to perform its functions with such a precarious tenure, and even then a higher rate of compensation would be required than where the tenure is more stable and certain."[17]

The judgment of the trial court awarding damages to the plaintiff for breach of the contract was affirmed.

State Board of Agriculture v. Meyers, 1904, 20 Colo.App. 139, 77 P. 372, reached a similar result, both on principle and on the authority of the Mudge case and Board of Education v. Cook, 1896, 3 Kan.App. 269, 45 P. 119. The court said [20 Colo. App. 139, 77 P. 373]:

"In making such contracts [for the employment of teachers], the length of time for which they should run depends upon what is for the best interest of the college. We think the statute has left the determination of this question * * * largely to the judgment of the board, and that such lodgment * * * is wisely made. * * *

"This action is to recover damages for the wrongful discharge of appellee. It is not a proceeding to prevent the removal of appellee * * * nor to reinstate him * * *. To hold that appellant is liable in damages for a breach of its contract with appellee is not to hold that it cannot remove him. * * *

" * * * While section 76, supra, gives to appellant the power to remove appellee, it does not absolve it from responsibility in damages if the discharge be wrongful.[18]

The court refused to follow the result and the reasoning in the Devol case. In reply to the assertion made in that case that interpreting the statute to permit the board to contract for a definite term, however short, would deprive it of power to discharge, "when, in its judgment, it was to the interest of the university to do so," the court said:

"The lack of power to discharge does not follow from the exercise of the power to employ for a definite time. * * * The existence of the contract no more deprives the board of the power to discharge than a contract of employment deprives a private corporation of the power to discharge an employé. The effect of the contract made under the power is not to prevent a discharge, but to create responsibility in damages for a wrongful discharge."[19]

█ We are neither required nor clearly asked[20] to hold in this case, nor did the trial court rule, that Howard University, under the statute, has no power to make a contract of employment other than one terminable at will. Such a decision would, in effect, determine the rights of other teachers and employees of the defendant, render legally ineffective the tenure regulations of 1933, and perhaps seriously handicap the university in its effort to secure men of competence to carry on its educational work.[21] In advance of the final necessity for making such a decision,

---

[17] 21 Dass.Ed. at page 174, 21 Kan. at page 230.

[18] 20 Colo.App. 139, 77 P. at pages 373, 374.

[19] 20 Colo.App. 139, 77 P. at page 376.

[20] While defendant's brief cites the Hunsicker, Devol and Darlington School cases and suggests that "It is reasonable to assume that the Board of Trustees had in mind that they could not bind their successors *not to remove* members of the faculty" [italics supplied] when they adopted the tenure regulations of 1933, and that the appointment of a professor "without term", as indicated in the tenure policy, "did not result in a contract" for employment until the age of retirement, emphasis in defendant's argument is placed upon the contention that plaintiff did not, rather than that he could not, secure permanent tenure from defendant.

[21] It is common knowledge that teachers, in seeking academic connections at the collegiate level, lay increasingly greater emphasis upon provisions for tenure and retirement. The American Association of University Professors, com-

and in view of the divided state of the authorities, we are unwilling to make it. The issues in this case do not require us to do more than decide that plaintiff is not entitled to reinstatement, as we must do if the language of Section 7 of the Act incorporating the defendant is to be given any effect.

The cases relied upon by appellant as sustaining his right to the relief here prayed are distinguishable, either by the absence of a statute such as is present here, or by the presence of a specific statutory provision investing public school teachers with the right of permanent tenure.[22]

It becomes unnecessary, therefore, for us to pass upon the other interesting and important issues, both of substantive and of remedial law, which were presented below and in argument here. For the reason given, the judgment is

Affirmed.

---

posed on January 1, 1939, of 14,595 members, devotes much of its effort toward promotion and protection of teachers' rights of tenure.

[22] See, for example, State of Indiana ex rel. Anderson v. Brand, 1938, 303 U. S. 95, 58 S.Ct. 443, 82 L.Ed. 685, 113 A. L.R. 1482; Blair v. United States ex rel. Hellmann, 1916, 45 App.D.C. 353; Whitwell v. United States ex rel. Selden, 1932, 61 App.D.C. 169, 58 F.2d 895; Gerritt v. Fullerton Union High School, 1938, 24 Cal.App.2d 482, 75 P.2d 627; Brumfield v. State ex rel. Wallace, 1934, 206 Ind. 647, 190 N.E. 863; State ex rel. Nyberg v. Board of School Directors, 1926, 190 Wis. 570, 209 N.W. 683.