Jonathan MARWIL, Plaintiff,

v.

Deane BAKER, Paul W. Brown, Gerald R. Dunn, David Laro, Robert E. Nederlander, Sarah Goddard Power, Thomas A. Roach, and James L. Waters, members of the Board of Regents of the University of Michigan, J. C. Mathes, Chairman of the Humanities Department of the College of Engineering of the University of Michigan, and Ralph Loomis and Dwight Stevenson, members of the Administrative Committee of said Department, Defendants.

Civ. A. No. 9-73331.

United States District Court,
E. D. Michigan, S. D.

Sept. 22, 1980.

562

Jerold Lax, Ann Arbor, Mich., for plaintiff.

Robert M. Vercruysse, Detroit, Mich., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILIP PRATT, District Judge.

This is a federal question action, wherein the plaintiff, Jonathan Marwil has alleged

the defendants,[1] J. C. Mathes, Ralph Loomis, Dwight Stevenson, and the individual members of the Board of Regents, Deane Baker, Paul W. Brown, Gerald R. Dunn, David Laro, Robert E. Nederlander, Sarah Goddard Power, Thomas A. Roach, and James L. Waters, violated certain Constitutional rights of the plaintiff. The action was brought under 42 U.S.C. § 1983 and jurisdiction is based on 28 U.S.C. § 1343, with pendent federal jurisdiction existing over several state claims.

The plaintiff was employed at the University of Michigan from September, 1973 to May, 1979. In May of 1978 the plaintiff received notice that his contract would not be renewed and that his employment with the University would terminate on May 31, 1979. The plaintiff alleges that his termination deprived him of due process, denied him equal protection, infringed on his right to free speech, was in breach of his contract with the University and tortiously interfered with contractual relations. Trial was held before this Court from July 7, 1980 to July 25, 1980. At the close of the plaintiff's case the defendants made a motion to dismiss under Fed. Rules Civ. Pro. 41(b). The Court granted the motion with respect to the free speech and the tortious interference claims and denied the motion with respect to the other claims.

## FINDINGS OF FACT

The University of Michigan is a state educational institution created under the Constitution of the State of Michigan. Its governing body is a Board of Regents whose members are elected in statewide elections after nomination by political parties in convention. The Board of Regents, among other duties and responsibilities, controls the appointment of faculty members and has the ultimate authority to grant tenure or terminate the employment of faculty members.

The University is divided into several Colleges, one of which is the College of Engineering. The Dean of the College of Engineering is appointed by the President of the University with the consent of the Regents. The College also has an Executive Committee composed of faculty members elected from various departments of the College who advise and assist the Dean but the latter is not bound by the advice and recommendations of that Committee.

The College of Engineering has several departments, one of which is the Department of Humanities. The Chairman of that Department is appointed by the Dean of the College, traditionally for a five–year term. The Chairman is assisted by the Administrative Committee composed of three faculty members elected for staggered three–year terms by their department colleagues. Again, the Administrative Committee acts only in an advisory capacity and the Chairman is not bound by its recommendations.

In laudable attempts to increase the role of the faculty in University affairs and to take advantage of the knowledge and experience of its faculty, the Board of Regents has provided for and recognizes a faculty organization known as the University Senate. The Senate is composed of faculty members elected by the faculty and serves various functions in improving the standards, quality and reputation of the University. One of its purposes is to advise the Board regarding all aspects of faculty matters. In this latter respect, the Senate has established the Senate Advisory Review Committee (SARC), one of whose functions is to act as an appellate review body in

1. In a Memorandum Opinion and Order issued July 3, 1980 this Court dismissed the plaintiff's action against the Board of Regents.

   For reasons of convenience the Court will use the term defendants throughout the opinion when referring to all or any number of the defendants. Certain counts of the complaint do not apply to specific defendants. The Constitutional claims of free speech, due process, and equal protection found in Counts I and II apply to all the defendants. The Breach of Contract claim found in Count III applies to Deane Baker, Paul W. Brown, Gerald R. Dunn, David Laro, Robert E. Nederlander, Sarah Goddard Power, Thomas A. Roach, and James L. Waters. The Interference with Contractual Relations claim found in Count IV only applies to J. C. Mathes, Dwight Stevenson, and Ralph Loomis.

disputed faculty matters. It is important to understand that the Senate and its various divisions may only recommend action to the University administration and the Board of Regents and that such recommendations do not restrict the discretion and authority of the administration nor of the Regents.

As alluded to earlier, the appointment, promotion, tenure and termination of faculty members is the responsibility of the Regents. In practice, recommendations for faculty employment action is initially made by the Department Chairman to the Dean of the College; the latter recommends to the President of the University (through the Vice President for Faculty Affairs) who, in turn, recommends to the Regents. The approval of the Regents constitutes the final action. It should be noted that rarely are the recommendations of Department Chairpersons and Deans overruled, this is particularly true when a recommendation is made that an appointment, promotion or tenure not be granted. It is also important to note, in the same vein, that Deans of Colleges and Chairpersons of Departments are given an appreciable degree of autonomy in faculty matters with a general admonition and restriction that conduct must not be inimical to University rules and policies.

It was in this setting that Jonathan Marwil was first hired as an instructor at the University. His status was that of a half-time visiting professor in the Department of Humanities of the College of Engineering for the 1973–1974 school year. He also was able to obtain a half–time visiting professorship in the Department of History of the College of Literature, Science and Arts for the same term. Subsequently, he was appointed as a full–time visiting professor in the Department of Humanities for the term beginning September 1, 1974 and expiring on May 31, 1975. During that time, his appointment was altered to that of assistant professor in order for him to obtain various fringe benefits, such as medical insurance. This change also resulted in his being placed on the "tenure track", an expression utilized to describe the time requirements which could eventually lead to

tenure. Tenure, as is now well–known, is a term of art in the education field and describes a status which confers on faculty members certain rights, chief among them being the right of continued employment unless there is good cause shown for termination after appropriate due process safeguards are met.

In the spring of 1975, the plaintiff was given another appointment as an assistant professor, this time for a two–year term, that is, from September 1, 1975 to May 31, 1977. In 1977, he was given an additional two–year appointment to begin September 1, 1977 and to terminate on May 31, 1979. In the interim, it was decided that the year spent as a visiting professor would also be credited to the plaintiff as if it were a regular appointment. The effect of that action is critical to an understanding of the issues here for it impacts directly on the tenure track and provides the basis for plaintiff's assertion that he is entitled to a tenure review. To underscore the significance of the various appointments, a recapitulation which includes the decisions regarding changes of status and their effects is warranted.

1. September 1, 1973 to May 31, 1974–a one–year contract.

2. September 1, 1974 to May 31, 1975–a one–year contract.

3. September 1, 1975 to May 31, 1977–a two–year contract.

4. September 1, 1977 to May 31, 1979–a two–year contract.

Thus, as is evident, plaintiff's contracts of employment in the aggregate covered a period of six years.

On May 19, 1978, defendant Mathes, the Chairman of the Department of Humanities, notified the plaintiff, in writing, that his contract would not be renewed beyond its expiration date of May 31, 1979.

The foregoing skeletal recitation of the basic, undisputed facts provides the backdrop for the drama that ultimately resulted in this lawsuit. At the risk of oversimplification, it is the position of the plaintiff that

since he was given an appointment which extended *into* a sixth year, he was entitled to a tenure review *during* the sixth year and the failure and refusal to provide that review forms the basis for his claims. On the other hand, the defendants contend that the contract expired by its own terms on May 31, 1979 and that the giving of notice of nonrenewal of the contract over one year before it was to expire afforded the plaintiff all of his rights and discharged the obligations of the University.

As is to be expected, a prologue gives only a hint as to the actual drama and is most often necessary when the plot is prolix. That is true here and following are additional factual findings pertinent to the required legal conclusions.

The appointments of the plaintiff as an assistant professor (as opposed to his appointments as a visiting professor) were made only after evaluations of his competency in accordance with newly initiated procedures, procedures that sought to improve the methods of renewal, promotion and tenure. It would be helpful at this point to delineate and describe these procedures and situate them in the context of this case since they became central issues.

In 1974, Richard Young, then Chairman of the Department, began the systematization of evaluation procedures to inquire into the performance and potential of the teaching staff. Each of these procedures were concerned with three major categories, i. e., scholarship, teaching and service. It was hoped that by utilizing these procedures the Chairman would be more fully informed in regard to his decisions to promote, renew or grant tenure and, in addition, would provide the opportunity and empiric basis for advising non–tenured faculty members regarding weaknesses in performance that might hinder their advancement, or as Young phrased it: "to give people regular feedback". In keeping with these avowed purposes, three distinct methods were developed: (1) a Performance Review Committee; (2) an Ad Hoc Contract Renewal Committee; and (3) an Ad Hoc Tenure Review Committee.

The Performance Review Committee is composed of the Chairman and the members of the Administrative Committee. Normally one of the members would compile the information available, discussion would follow and the Chairman would prepare a summary or report which was submitted to the affected faculty member. Informal conferences could then follow at the request of the faculty member with the Chairman or the Committee.

The Ad Hoc Contract Renewal Committee, instituted in 1977, is composed of tenured faculty members of the Department appointed by the Chairman after consultation with the Administrative Committee and after notification from the College that a given nontenured faculty member's contract was approaching its expiration date. This Committee would evaluate performance using the same major criteria and submit its report to the Chairman and to the affected faculty member.

The third type of evaluation is conducted by an Ad Hoc Tenure Review Committee. This procedure was approved by the College of Engineering's Executive Committee in November of 1974. The Tenure Committee is composed of three individuals, two tenured faculty members of the Department and a tenured faculty member from outside the Department. This Committee is appointed by the Executive Committee of the College with the assistance of the Department Chairman and the Administrative Committee. As with the other two Committees, teaching, scholarship and service are evaluated. The Committee asks the faculty member for a resume, a list of outside references, a statement of professional objectives and any other information it may require. The Committee then compiles a report which it sends to the Chairman of the Department and the Administrative Committee who then submit the report along with their recommendations on whether tenure should be granted to the College's Executive Committee and its Dean.

These three procedures are not used universally in the various colleges and depart-

ments of the University of Michigan. Furthermore, their use in the College of Engineering, and specifically in the Department of Humanities, is a fairly recent development with all of the procedures having been developed and adopted some time subsequent to Marwil's appointment in 1973.

A performance review of Marwil was conducted in the spring of 1975. In the written summary that followed the review it was acknowledged that Marwil had been given a two–year appointment as an assistant professor of history in the Department of Humanities. The report also included comments on Marwil's teaching, scholarship, and service. The report encouraged Marwil to improve his "scholarship" by publishing more material. In addition, the report informed Marwil that he had been appointed Chairman of the Department's Faculty Affairs Committee, explaining that this was an opportunity for the plaintiff to demonstrate his ability to work on Committees and to get along with other members of the faculty, an integral element of the service category.

In April of 1976 another performance review was conducted. Richard Young's position as Chairman of the Department expired in the spring of 1976 and J. C. Mathes then became the Chairman. Young wrote the summary of the 1976 performance review but did not complete it until the fall of 1976. In this summary, dated November 11, 1976, service, teaching and scholarship were discussed. Scholarship was again mentioned as an area which needed improvement. Another area that was discussed in some detail was the problem of the plaintiff's abrasiveness in his relationships with others. Young explained to the plaintiff that one faculty member had asked not to serve on a committee with him because of this problem and that a teaching assistant had complained that the plaintiff had been excessively harsh in his criticisms.[2]

In June of 1977 an Ad Hoc Contract Renewal Committee was formed to evaluate plaintiff's performance and to make a recommendation to the Department Chairman, J. C. Mathes, and the Administrative Committee. The Contract Renewal Committee was composed of Professors Hughes, Sawyer and Shafter. This Committee decided to recommend that Marwil be reappointed; the recommendation in its final form was not unanimous with Sawyer recommending against reappointment.

In a memo sent by Chairman J. C. Mathes to Marwil on June 27, 1977, the plaintiff was informed that his contract had been renewed for two years. The memo also included extensive comments on Marwil's performance in the Department. This memo outlined some "serious reservations" that had been raised during the contract renewal deliberations, reservations that had tenure implications. The thrust of this memo was to inform the plaintiff that his scholarly productivity and his ability to provide service to the Department were areas where improvement was essential if the plaintiff was to have a future in the Department. In sum, the plaintiff was informed that the amount and appropriateness of his scholarship were concerns as was

---

**2.** While this Court would prefer not to go into the specific instances of conduct which evidence the plaintiff's abrasive behavior, this is necessary to some extent in order to comprehend the Court's rulings. Two specific incidents are fairly representative of the problem. The first involved a Professor Hunt of the University of South Wales who was visiting the University for the school year 1977–1978. Professor Hunt needed some household supplies and other essentials and was reluctant to make expenditures for items that would be used for less than a year and left behind. Upon the recommendation of a professor of the Humanties Department he sent a memo to the faculty requesting a loan of such supplies. Plaintiff responded by returning the memo to Professor Hunt with a curt note that Professor Hunt could obtain these articles at a local store. Another incident occurred when the plaintiff learned that Chairman Mathes had informed the faculty that it was considering giving the plaintiff notice of non–reappointment. The plaintiff became outraged and went to the Chairman's office, and berated him in a loud voice. This was done in the doorway of the office in full view of whomever may have walked by. While neither of these incidents shock the conscience they do evidence plaintiff's lack of tact and his sometimes intemperate behavior.

his contentious and intemperate behavior. The memo explained that had this been the time for a tenure decision the consensus was that the plaintiff would have been given a one–year terminal appointment. It was decided, however, that the plaintiff should be given a two–year appointment so that the Department could more effectively evaluate his performance in making a tenure decision.

Upon receipt of this memo plaintiff testified that he was shocked, angered and confused. Consequently, plaintiff requested a meeting with the Administrative Committee and the Chairman to discuss the report. The meeting was held and there was considerable discussion on the issue of the plaintiff's scholarship, service and personality. After this meeting the plaintiff sent a memo to the Chairman and Administrative Committee concerning the June 27, 1977 report, and the subsequent meeting. The plaintiff intended the response to indicate why he thought the "committee's letter seriously misrepresented [his] . . . accomplishments, abilities and person."

In late 1977 plaintiff requested that a promotion review committee be formed for the plaintiff. Chairman Mathes and the Administrative Committee denied the plaintiff's request explaining that "[i]n our judgment the questions that arose during the contract renewal discussion indicate that a prior question concerns tenure. We renewed your contract for two years to enable you to further develop your case for tenure and possible promotion at a later date." At this point the plaintiff felt that he was guaranteed a tenure review in 1979.

In February and March of 1978 there were a series of departmental meetings at which the departmental policy and criteria for hiring was discussed. There was considerable testimony concerning these meetings, the subjects discussed and the tenor of those discussions. Discussion at those meetings was intense, eventually became heated and the atmosphere, specifically at the third meeting, became volatile. The plaintiff admitted that he may have been contentious at the second meeting, and also testified that he was angry and became quite heated at the third meeting. Some of those at the third meeting felt the plaintiff had been abrasive, contentious, and intemperate. Defendant Stevenson felt the plaintiff had misrepresented the Dean's views on a particular issue.

These three meetings triggered certain events which contributed to the ultimate decision to give the plaintiff notice of non–reappointment. Former Department Chairman Young and Sawyer wrote letters to the Administrative Committee and Chairman Mathes asking that plaintiff be given notice of non–reappointment. Defendant Stevenson explained that after the meetings, which he found particularly upsetting, and in light of the Professor Hunt incident and the letters from Sawyer and Young, the Administrative Committee felt something had to be done. Consequently a meeting was set up between the Chairman, the Administrative Committee, the Dean and the Executive Committee to determine the proper procedure for considering the issue of whether the plaintiff would be reappointed.

Initially, the Executive Committee of the College suggested that an Ad Hoc Committee be appointed. However, on April 19, 1978 the Executive Committee sent Chairman Mathes a memo explaining that the matter of notice of non–reappointment was a Departmental question and that its procedures and those found in The Standard Practice Guide should be followed.

In mid April, 1978 the plaintiff became aware of the fact that the Administrative Committee and the Chairman were investigating the possibility of giving notice of non–reappointment. The plaintiff contacted Dean Ragone and told the Dean he felt it would be inappropriate for the Department to evaluate his fitness in the middle of a two–year contract.

Sometime near the end of April, 1978 a faculty meeting of the tenured staff was held. Of the 17 tenured faculty members approximately 15 were in attendance at some time during but not throughout the meeting. At this meeting defendant Loom-

is presented two proposals: (1) Should Marwil be given notice of non–reappointment, and (2) Should Marwil be given another year beyond his present appointment. These proposals were voted on at the meeting. The vote was 6 to 2 against giving Marwil notice of non–reappointment and 6 to 2 in favor of giving Marwil an additional year. The members of the Administrative Committee did not vote.[3]

On May 2, 1978 Chairman Mathes sent Marwil a memo informing him that a performance review was going to be conducted and that the giving of notice of non–reappointment would be considered. The memo invited Marwil to submit any material he wished to have considered. Marwil responded in a letter to the Administrative Committee insisting that a performance review at that time was inappropriate and that the appropriate procedure would be to give the plaintiff a tenure review during his sixth year.

Sometime before May 19, 1978 defendants Mathes, Loomis and Stevenson met to review Marwil's performance.[4] In this review the defendants examined the plaintiff's teaching, evaluations, read some or all of his publications, read the reviews of his book, read past performance reviews and examined materials submitted by the plaintiff and others. The three traditional areas of scholarship, service and teaching were all considered. After what they termed was an exhaustive evaluation Chairman Mathes, in a May 19, 1978 letter, notified Marwil that his appointment would not be renewed and that his employment with the Department would terminate on May 31, 1979, the expiration date of his contract.

Upon receiving notification of non–reappointment the plaintiff decided to appeal the decision. The first step towards appeal was a call by the plaintiff to the Dean of the College informing the Dean that he wished to appeal. Dean Ragone set up an appeal hearing in mid June of 1978. At that hearing, before the Executive Committee, the plaintiff was given one hour to present his position followed by a one hour presentation by the Administrative Committee. On June 19, 1978 Dean Ragone sent a letter to Marwil notifying him that the Executive Committee had affirmed the decision of Chairman Mathes and the Administrative Committee.

After receiving the letter from Dean Ragone, Marwil appealed to the Senate Advisory Review Committee (SARC). The appeal to SARC was filed on September 5, 1978, a hearing was held on October 18 and a report was issued on November 13. In the report SARC recommended that Marwil be given a tenure review and at a minimum a one–year terminal appointment, subsequent to his sixth year. SARC based its ruling on its interpretation of the customs, rules and policies of the College of Engineering. Furthermore, SARC concluded that Marwil deserved a tenure review on a theory similar to promissory estoppel and in addition SARC felt that a tenure review should be given in an effort to improve the "collegiality" in the Department.[5]

The SARC report was sent to the Executive Committee of the College of Engineer-

3. The significance of the vote was a matter of contention. Since all faculty members were not present and even of those present some did not vote, the parties spent a great deal of time making alignments. The relevancy of the vote under the circumstances of this case is perhaps most impressive in support of the argument that the plaintiff had a divisive influence on the Department.

4. The other member of the Administrative Committee did not participate because he was a non–tenured faculty member and according to departmental policy non–tenured faculty could not participate in performance reviews.

5. The SARC report and recommendation were introduced as an exhibit and considered. The Court takes the liberty of commending the SARC members for their conscientiousness and sincerity; their report is a paradigm of analysis and logic and was most helpful to the Court in understanding some of the underlying conflicts in this case. To be sure, the SARC findings and recommendations do not coincide with this Court's ruling but that is understandable since this case is cast in an adversarial mode and different rules and principles apply. The Court reserves its comment on which forum is most likely to achieve the proper resolution.

ing by then University Vice–President Shapiro for its information, comment or further action. In a letter to Professor F. L. Bartman, Chairman of SARC, Dean Ragone informed SARC that the Executive Committee had decided not to adopt the recommendations of SARC. Ragone explained that SARC had completely misinterpreted the rules of the College and that "[t]he University has the clear right to terminate non–tenured faculty at the end of an appointment period upon giving proper notice." Vice–President Shapiro met with the Dean, the Executive Committee, the plaintiff and the Administrative Committee at different times to discuss the SARC report and other aspects of the case.

In Shapiro's continuing investigation he next consulted with the staff in Central Administration, specifically a policy coordinator and concluded, after his investigation, that a second review of the plaintiff should be conducted. Shapiro explained that the reason for his decision was not because custom had been violated but rather in deference to SARC to defuse the surrounding political problem and "to go the last mile".

On February 9, 1979 the plaintiff received a letter from Chairman Mathes informing him that another review would be conducted. The second review was conducted by a committee appointed by Chairman Mathes and composed of Professors Loomis, Mathes and Hughes. Professor Hughes was a tenured faculty member in the Humanities Department who was a known supporter of Marwil. This Committee was instructed to review the case again and to consider particularly the opinions of people outside of the University as to the quality of the plaintiff's scholarship.

By a 2 to 1 majority this Committee affirmed the previous decision not to reappoint the plaintiff. Professor Hughes dissented explaining that he felt the plaintiff's record warranted reappointment. The plaintiff again appealed to the Executive Committee and he was given the opportuni-

ty to appear and present his case. In addition, the Executive Committee met with the Administrative Committee to discuss the procedures that had been used. In an April 23, 1979 memo Dean Ragone informed Chairman Mathes and the plaintiff that the Executive Committee had concluded that the proper procedures had been followed and that the decision not to reappoint Marwil was affirmed.

In late April or early May of 1979 the Senate Advisory Committee on University Affairs [6] (SACUA) contacted the plaintiff and asked him if he would approve of its discussing his case with the Board of Regents. The plaintiff had no objection and SACUA appeared before the Regents to urge that the recommendations of SARC be adopted. At yet another Regent's meeting the plaintiff also appeared with supporters and advocated his position. Evidently, those appearances had no effect, for his employment terminated on May 31, 1979.

Having fully exhausted all the review procedures at the University the plaintiff brought this action. When the case came to trial there were eleven defendants, J. C. Mathes, Ralph Loomis, and Dwight Stevenson (members of the Administrative Committee), Deane Baker, Paul W. Brown, Gerald R. Dunn, David Laro, Robert E. Nederlander, Sarah Goddard Power, Thomas A. Roach, and James L. Waters (members of the Board of Regents), all alleged to have violated plaintiff's Constitutional rights of free speech, equal protection and due process. In addition, the plaintiff claims that the defendants' actions were in breach of his employment contract and tortiously interfered with those contractual relations. The free speech and tortious interference claims were dismissed at the close of the plaintiff's case pursuant to a F.R.C.P. 41(b) motion.

## THE MERITS

The Court will first take this opportunity to develop more fully the basis and reason-

**6.** This is a body of the University Senate with the function of implementing the actions of the Senate.

ing for its ruling on the free speech and tortious interference claims. The Court will then consider the equal protection, breach of contract and due process claims.

## I. FREE SPEECH

Marwil has asserted that it was his participation in the meetings of February and March, 1978, that was the motivating factor in the decision to give him notice of non–reappointment. The plaintiff made two proposals which related to the hiring practices of the Department. The first of these proposals concerned whether the ability or potential of a teaching candidate to attract funded research should be considered in hiring decisions. The second proposal concerned whether the teaching staff should have an opportunity to participate in the selection of the persons appointed to search committees.[7] Chairman Mathes had determined that these motions were out of order and that since these matters were within the Chairman's prerogatives, any vote would be meaningless. There was considerable discussion on the issues themselves and on whether the proposals were out of order.

The plaintiff argues that his proposals were contrary to the position that the Administrative Committee and Chairman held and that the decision to review the plaintiff's appointment was actually based on the desire of the defendants to stifle the plaintiff's attempt to expand the power and influence of the faculty. In contrast the defendants have consistently maintained that it was the manner of Marwil's speech, not the content, that influenced their decision to review the plaintiff's employment.

At the close of the plaintiff's case this Court was convinced that the plaintiff had failed to establish that his right to freedom of speech had been violated. Subsequent testimony at trial has only buttressed that conclusion. In the plaintiff's Supplemental Trial Brief the Court is urged to reconsider its ruling. As support for this request the plaintiff relies on the Supreme Court opinion in *Pickering v. Board of Education*, 391

U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). While that opinion certainly has application to the present case, the plaintiff has missed the mark with respect to the appropriate legal standard and the application of that standard.

■ The plaintiff has the burden of establishing two elements before the Court can properly find that the First Amendment has been violated. It must be shown that:

(1) The plaintiff has engaged in protected speech; and

(2) That the plaintiff's constitutionally protected speech played an active role in his dismissal.

*See Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1978).

Furthermore, if the defendants can show that the plaintiff would have been dismissed even in the absence of the protected activity then no relief can be granted. *Id.*

Initially, this Court has some doubts as to whether the plaintiff's speech at the meetings constituted protected activity in the constitutional sense. In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1976) the Court explained:

"That question of whether speech of a government employee is constitutionally protected expression necessarily entails striking 'a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' *Pickering v. Board of Education*, 391 U.S. 563, 568 [88 S.Ct. 1731, 1734, 20 L.Ed.2d 811] (1968)." *Id.* 284, 97 S.Ct. 574.

The plaintiff asserts that "[f]unded research is a matter of great concern ... to the public at large" and that the issue of faculty participation in selecting commit-

---

7. A search committee is a group of faculty members given the task of locating, evaluating and recommending candidates for teaching positions.

tees is also one of public concern. These bald and unilluminating assertions are not convincing. They are issues that are remote, even esoteric, insofar as the public is concerned and no persuasive evidence has been presented which would serve to show otherwise.

■■■ An additional factor in determining whether the plaintiff's speech was protected is the context of the speech. In *Givhan* the Court explained that in striking the *Pickering* balance, consideration must be given as to whether the expression was public or private. The Court explained:

"Private expression may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time and place in which it is delivered."

*Givhan, supra*, footnote 4.

The facts as presented by the plaintiff when applied to the standard outlined above raise considerable doubts as to whether the plaintiff was engaged in protected speech. The plaintiff's comments on funded research and faculty participation in hiring fall far short of the protected speech in *Givhan* which concerned allegations of racial discrimination. The forum was not a public meeting but a gathering of faculty members. Furthermore, the State's interest in this case of promoting efficiency in the department and maintaining the proper atmosphere for learning and teaching warrant due consideration. Consequently, were the Court to balance the interests in this case, as required by *Pickering*, the conclusion may very well have been that the plaintiff's speech was not protected. That issue, however, need not be decided here since, assuming the plaintiff's speech was protected, this Court concluded that the content of that speech did not play a role in the decision to give notice of non–reappointment. The evidence did not establish that what the plaintiff said was a factor in the decision; rather it was the plaintiff's

manner that influenced the decision. There were numerous faculty members who supported the plaintiff's proposals yet there was no evidence that any retaliatory action was taken against them. The plaintiff had a history of contentious, intemperate and abrasive behavior. The third meeting particularly appears to have been another example which led some to conclude that the best interests of the Department required further action.

After the meetings, former Chairman Young felt compelled to write a letter to the Chairman and the Administrative Committee urging that the plaintiff's contract not be renewed. Young explained that the plaintiff's behavior over the past year "had been aggressive, intemperate, arrogant, at times abusive, and extremely divisive." Former Chairman Sawyer also felt compelled to write the Chairman and the Administrative Committee. Sawyer explained that he considered the plaintiff a rash, intemperate and unreasonable young man and that his behavior was such that Sawyer felt the plaintiff should not be reappointed. The letter sent by Mathes to Marwil, notifying the plaintiff of the decision not to reappoint, stated that the plaintiff's abrasive behavior limited his ability to work with other faculty members. Mathes explained that the plaintiff's behavior was a relevant factor because it had limited Marwil's "ability to perform professionally".

This Court concluded at the close of the plaintiff's proofs that no evidence had been offered that established that the content of the plaintiff's speech played a role in the termination decision. The testimony during the defendants' case only reinforced that conclusion.

■■■ Finally, as the Court explained at the time of its ruling, had the plaintiff shown that protected speech played a role in the termination the evidence before the Court did not establish that the plaintiff would not have been terminated but for that activity. The Court in *Givhan* determined that if a defendant can establish the decision to terminate would have been made regardless of the protected speech

then the plaintiff cannot prevail. This Court remains convinced that the content of the plaintiff's speech played no role in the decision to give notice of non–reappointment and even if it had played some role the plaintiff would still have been terminated. This affirmative defense was established during the plaintiff's case–in–chief. The Court therefore concludes that the plaintiff's First Amendment rights were not violated and the ruling dismissing that claim is affirmed.

## II. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

The plaintiff claims that defendants Mathes, Loomis and Stevenson wrongfully caused his employment to be terminated and are therefore liable for the tort of interference with contractual relations. This claim was also dismissed pursuant to the defendants' Rule 41(b) motion. The Court here affirms that ruling.

Michigan law recognizes that unlawful interference with another's contractual rights constitutes an actionable tort. State law elucidates that "[a] prima facie case is established when plaintiff proves the intentional procurement of a breach of contract." *Wilkinson v. Powe*, 300 Mich. 275, at 282, 1 N.W.2d 539, at 543 (1942). The plaintiff must show that the defendant intentionally and without reasonable justification induced a breach of contract. It must be shown that the defendant intentionally did a wrongful act, illegal in character and without social justification that results in a breach of contract. *See Krause v. Hartford Accident & Indemnity Company*, 331 Mich. 19, 49 N.W.2d 41 (1951).

As will become apparent later in this opinion, this Court concludes that there was no breach of contract. Therefore the defendants could not have tortiously induced

a breach. But insofar as the plaintiff may be claiming that the defendants tortiously interfered with his prospective contractual relations, specifically his expectation of reappointment, the Court finds no evidence to support a claim that the defendants did anything wrong or that the defendants' action was without reasonable justification. It is clear to this Court that the defendants were reasonably justified in terminating his employment on the basis of what they saw as deficiencies in the plaintiff's teaching, scholarship and service. The Court, therefore, affirms its decision dismissing the plaintiff's claim of interference with contractual relations.[8]

## III. EQUAL PROTECTION

The plaintiff claims that the actions by the defendants denied him equal protection of the law. This position is based on the assertions that "no faculty member in his sixth year other than Marwil, has failed to obtain a tenure review." Furthermore, the plaintiff contends that since the adoption of the contract renewal policy no other faculty member has been the subject of a reappointment decision without the formation of an Ad Hoc Contract Renewal Committee. According to Marwil, this constitutes disparate treatment in violation of the Equal Protection Clause.

It is true that no other faculty member failed to obtain a tenure review in a sixth year in the Humanities Department; however, it is necessary to point out that since the adoption of the tenure review policy in 1974 Marwil was the first tenure track faculty member to have a contract running through the sixth year. Thus no faculty member ever received a tenure review in the sixth year during the time Marwil was in the Department. In addition, the plain-

---

8. In its ruling after the close of the plaintiff's proofs, the Court also held that the plaintiff had presented absolutely no evidence to support his claim that the individual defendants, Mathes, Loomis and Stevenson, had acted out of malice and to further their own interests. The plaintiff asks that this issue be re–examined and insists that malice was proven. The

Court is convinced that its original ruling was correct. Professors Mathes, Loomis and Stevenson obviously harbored no personal animus or malice toward the plaintiff and demonstrated to this Court's satisfaction that they acted in good faith with the welfare of the Department as the paramount consideration.

tiff's assertion pertaining to the failure of the Department to appoint an Ad Hoc Contract Renewal Committee is spurious since the contract renewal policy did not apply.[9]

■ The situation involved in this case is not a common occurrence in the College of Engineering. There is no evidence of another situation in the Humanities Department where circumstances militated the giving of notice of non–reappointment to a faculty member in the middle of a contract. The uniqueness of the situation is simply this: it was the first time that a faculty member with a contract running through the sixth year was advised *before* the sixth year began that he would not be reappointed. The uniqueness of the situation in and of itself renders the Equal Protection Clause inapplicable. *See Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). An equal protection claim must be based on an assertion that similarly situated individuals are treated differently. In this case there is no evidence that similarly situated individuals were treated differently.

■ Assuming that the plaintiff was treated differently than other similarly situated persons there would still be no equal protection violation. The plaintiff has not established the existence of any suspect classification or the deprivation of any fundamental constitutional right. Therefore, the inquiry is whether the State's "classification" is reasonably related to a legitimate government interest. *Harrah Independent School District v. Martin*, 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979).

■ The University and those administrators concerned with faculty hiring decisions have a legitimate interest in maintaining and improving the quality of its faculty. Where administrators feel a faculty member's association with the University is no longer beneficial, any means rationally related to the goal of improving the faculty will weather an equal protection challenge. The sanction of non–reappointment was

certainly rationally related to the University's interest in maintaining and improving the quality of its faculty. The plaintiff was not, therefore, deprived of equal protection of the laws.

## IV. BREACH OF CONTRACT

Marwil maintains that he was guaranteed, by his contract with the University a tenure review in his sixth year, or at least an ad hoc renewal committee, and a seventh terminal year. Accordingly, the plaintiff asserts that the defendants' actions were in breach of that contract. The plaintiff finds these contractual obligations in the rules and policy statements of the University, in the University and Department customs and in specific statements made to him.

■ In Michigan an employee can have contractual rights in the procedures and benefits found in statements of policy. *See Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980). The Court in *Toussaint* explained that those contractual obligations can be implicit in the policies and practices of the employer. That Court cited and adopted the position taken in *Perry v. Sindermann* by the United States Supreme Court:

> "[T]he law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.' Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.' And, [t]he meaning of [the promisor's] words and acts is found by relating them to the usage of the past."

408 Mich. at 617–18, 292 N.W.2d at 894, citing *Perry v. Sindermann*, 408 U.S. 593, 601–03, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972).

This Court understands the decision in *Toussaint* to stand for the principle that rules and customs may create binding contractual obligations. *See also Grand Trunk*

---

**9.** That policy applies to reviews conducted in the final year of a contract. The review conducted in 1978 was not in the final year of a contract and the contract renewal policy did not apply.

*Western Railroad Company v. H. W. Nelson Company*, 116 F.2d 823 (6th Cir. 1941).

The defendants in the present case never denied that custom created contractual obligations. Testimony offered by the defendants established that the written rules and policies were not the exclusive source of the procedures followed by the College and that custom played a role.

■ Michigan's state law also recognizes the doctrine of promissory estoppel.

"The elements of promissory estoppel are (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, (4) in circumstances such that the promise must be enforced if injustice is to be avoided."

*McMath v. Ford Motor Co.*, 77 Mich.App. 721, 725, 259 N.W.2d 140, 142 (1977). Therefore, specific statements made to the plaintiff may have created obligations not found in the rules or customs of the University.

The Court will now determine what procedures the customs and rules of the University require and how specific statements made to the plaintiff may have expanded the contractual obligations.

### A. *Seventh Terminal Year*

■ Marwil claims that his contract running through the sixth year was actually a contract running through the seventh year. This claim is based on the plaintiff's interpretation of the Policies for Promotion and Tenure (plaintiff's Exhibit 39) provision which states "[a]n assistant professor not recommended for promotion before the end of the sixth year will ordinarily at that time be given a terminal appointment for one year." The Executive Committee Guidelines (plaintiff's Exhibit 40) also provide for a one year terminal appointment when an assistant professor is not recommended for tenure at the end of the sixth year. According to the plaintiff this turns a sixth

year contract into a seven year contract. This Court finds little support for that argument in this record.

In the same provision of the Policies for Promotion and Tenure it is stated that after a faculty member is with the Department for two or more years notice of non–reappointment should be given at least 12 months prior to the expiration of an appointment. The Rules of the Faculty of the College of Engineering, Article XI, B, 1 (defendants' Exhibit 3) has a very similar provision.

These different provisions may appear conflicting but this Court finds them entirely compatible. The provisions establish different procedures for dealing with different situations. If a department wishes to give notice of non–reappointment it must do so within the specified time. If no timely notice is given and the department wishes to terminate the employment then a 12 month terminal appointment must be given. This construction not only gives meaning to both provisions but is also supported by the evidence and appears to this Court to be the clear and the intended interpretation.

Thus, the Court finds that the defendants were under a duty to give the plaintiff 12 months notice of the non–reappointment decision or to give a one–year terminal appointment. Since the defendants properly gave the plaintiff notice of non–reappointment there was no breach.

### B. *Tenure Review*

The plaintiff also alleges he had a contractual right to a tenure review. In support of this position plaintiff relies on the Promotion–Tenure Procedure (as approved by the College's Executive Committee, November 26, 1974) (plaintiff's Exhibit 37).[10] Furthermore, the plaintiff asserts that this obligation is found in the customs of the Department and University and that statements were made to him that he interpreted as guaranteeing a tenure review.

10. Plaintiff does not claim he relied on this provision since he was not aware of it until

after he received notice of non–reappointment in June of 1978.

**(1). *Statements Made to the Plaintiff***

The plaintiff does not contend that any of the defendants or any other administrator ever specifically told him he would get a tenure review in his sixth year. In fact the testimony established that the plaintiff was never told, prior to receiving notice of non–reappointment, that he would or would not get a tenure review. The plaintiff does, however, contend that certain statements made to him justifiably led him to believe he would get a tenure review.

In a memo sent to the plaintiff by the Chairman and Administrative Committee in December of 1977 Marwil was told that the Committee renewed his contract "for two years to enable [him] to further develop [his] case for tenure and possible promotion at a later date." Another memo sent by Dean Sinnett to Marwil may also have given the plaintiff the impression that he would get a tenure review. In that memo the plaintiff was informed that his first year as a visiting professor would count on the tenure track and that a tenure decision would have to be made before May 31, 1979. The plaintiff also testified that he had conversations with Mathes and Stevenson at which they discussed what he would have to do to obtain tenure.

These statements, both written and oral, do not in this Court's opinion establish an adequate evidentiary base for plaintiff's claim of justifiable expectation of a tenure review and he has failed in his burden in this respect. They are, indeed, slender reeds on which to build a contractual term. The import of the statements from Department members is an admonition that he needed to improve and progress if he expected to receive tenure not that a tenure review would be given. The memo from the College Dean merely reiterated the time within which a tenure decision would have to be made under the rules and policies of the College, not that a tenure review would be afforded to him. Certainly when balanced against the clear contract terms regarding expiration on a given date and plaintiff's awareness through his own experience with his prior appointment contracts of expiration dates, the statements cannot be relied upon to alter those contract terms. Nor is the Court convinced on this record that those statements can be the basis for a conclusion that the University would forego its contractual right, under its rules and policies, to decide not to reappoint or renew a contract of employment. In sum, the evidence is not persuasive and the plaintiff's claim in this regard must be considered unproven.

**(2). *Custom***

Marwil also contends that custom demands that he should have been given a tenure review in his sixth year. Custom is an area of contract law through which the courts must travel prudently. Only upon a clear showing of custom, nigh universally understood, should a court impose obligations based on custom.

That there is a custom at the University of Michigan or specifically in the College of Engineering that mandates a tenure review in the sixth year of a tenure track appointment has not been established in this Court. The tenure review policy under which the plaintiff claims he was entitled to a tenure review was not adopted until 1974. There were no reviews conducted in the Department of Humanities between 1974 and 1978. Therefore, there were no previous cases from which custom can be gleaned. Prior to 1974 the testimony established that tenure decisions were made very informally and there were no Ad Hoc Tenure Review Committees. Thus the custom prior to 1974 is of little value in determining the custom in 1978.

The Rules of the Faculty of the College of Engineering (defendants' Exhibit 40) give the Executive Committee a great deal of discretion in determining the procedure for making tenure decisions. The Policies for Promotion and Tenure (plaintiff's Exhibit 39) clearly gives the Department some leeway in the procedures it chooses to use.

The foregoing lead this Court to the conclusion that there is no University or Department custom requiring a tenure review

in the sixth year. In addition, the testimony established that under the custom prior to 1974 the plaintiff would not have been entitled to a tenure review and that no custom had been established with regard to the policy adopted in 1974.

The situation in the present case was a unique occurrence at the University. There was no evidence of another occasion where a Department Chairman and two former Department Chairmen felt compelled to recommend notice of non–reappointment be given in the fifth year of a six year contract. Unquestionably, the normal chain of events would be a tenure review in the sixth year followed by either a one–year terminal appointment or the granting of tenure. But the present case does not fit the mold and without a clear showing of custom this Court will not bind a public employer to a policy which seems clearly inapplicable. The testimony of the various witnesses only established that there is no agreement as to what the custom of the University or the Department was. Many testified there was no custom guaranteeing a tenure review in the sixth year. Others testified there was such a custom. Vice–President Shapiro, whose responsibilities included promotion and tenure, testified that prior to this case the words "tenure review" held no special meaning for him.

Of particular significance here is that although there was testimony by some witnesses that it was the custom to grant a tenure review to a faculty member who was actively teaching in his sixth year, there was no testimony that it was the custom also to grant a tenure review to a faculty member who although teaching in his sixth year had already been advised that his contract would not be renewed beyond that sixth year. Nor was there any testimony that custom dictated that a contract which ran through the sixth year could not be terminated even though the decision not to renew was made and communicated one year prior to expiration.

"Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.

. . . Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). This Court will not enforce contractual obligations based on a custom which at best finds only tenuous support in the facts.

*(3). The Rules and Written Policies*

■ The plaintiff's final contention is that the rules and written policies of the University require a tenure review in the sixth year. This position is supported by reference to the Promotion–Tenure Procedure (as approved by the College's Executive Committee, November 26, 1974) (plaintiff's Exhibit 37). Section 1 of that document explains: "In general, departmental procedures shall determine candidates for promotion and for tenure. Certain cases shall be considered automatically, such as professors in their sixth year at the University without tenure." The plaintiff also implies the duty to give a tenure review in the sixth year from the Executive Committee Guidelines: "It is the policy of the Executive Committee that an Assistant Professor who is not recommended for tenure at the end of his sixth year of service will at that time be given a written notice to that effect . . ."

The Court finds no support for the plaintiff's position in the Executive Committee Guidelines. The provision that plaintiff relies on does not even mention the words "tenure review" let alone guarantee such a review in the sixth year. It is the provision found in the Promotion–Tenure Procedure document which facially lends support to the plaintiff's contentions. Upon careful examination of the policies behind that section and considering that section in light of the other sections and rules of the Department and the University the Court concludes that the provision does not guarantee a tenure review.

Dean Ragone, who was one of the drafters of the Promotion–Tenure Procedures and encouraged the Department to adopt it,

explained that the provision in question was created to deal with the defacto tenure [11] problem. Where a decision to give notice of non–reappointment has been made prior to the sixth year the defacto tenure problem does not exist. Thus, at least one of the policies behind the provision was inapplicable in this case and lends support to the position that a tenure review was not required here.

More importantly, that provision does not supersede other rules and policies regarding non–renewal and it must be read with due regard to those rules and policies. Certainly it must be read so as not to do violence by remote implication to such policies. By far the most reasonable interpretation is that if a faculty member is in his sixth year *and* has not been previously notified that his contract would not be renewed, he should be given a tenure review. Surely had the intention been that this provision would have the effect of nullifying non–renewal rules and depriving administrators from deciding not to reappoint a non–tenured faculty member, the language would have been explicit in that regard. It should be borne in mind, as the testimony revealed, that non–tenured faculty may receive appointments for varying terms, one–year, two–year, three–year, or for that matter even longer, with three–year contracts apparently being common. To say that the foregoing provision has the effect that plaintiff contends would mean that an administrator would be bound by his decision made years before despite a later determination that a tenure review is not warranted and that a three–year appointment, for example, was in reality a four–year appointment. Stating the proposition is enough to destroy it.

The provision concerning the appropriate procedure for giving notice of non–reappointment supports the Court's conclusion. Considering the different provisions concurrently it is apparent that they were intended to deal with different situations. The provisions concerning non–reappointment deal with the situation, such as found in this case, where the department decides it wishes to terminate the employment relationship. The provisions providing for tenure review in the sixth year apply to the situation where no decision has been made as of the sixth year. If the Department decides against tenure in the fifth year and gives a one–year terminal appointment, if the faculty member decides to leave the University at the end of the sixth year or if notice of non–reappointment has been given, as in this case, the provision in question is inapplicable.

The Court, therefore, concludes that neither the customs, rules or specific statements made to the plaintiff created a contractual right to a tenure review in the sixth year and that there was no breach of contract by the actions of the defendants.[12]

## V. DUE PROCESS

The plaintiff's principal constitutional claim is that the actions of the defendants deprived him of due process of law. Specifically, the plaintiff asserts that he had a property right in a tenure review and that he was deprived of that right without due process. Additionally, the plaintiff asserts he had a liberty interest in preserving his good name, reputation and professional integrity and that the actions of the defendants have stigmatized him without due process.

11. Defacto tenure occurs where a non–tenured faculty member serves for seven or more years. Once the faculty member has reached the seventh year he automatically acquires tenure.

12. The plaintiff also contended that even if the defendants could give him notice of non–reappointment in the fifth year they could only do so by forming an Ad Hoc Contract Renewal Committee. Since this was a notice of non–reappointment decision, as opposed to a contract renewal the Court cannot understand the plaintiff's position.

.Here again there are two separate provisions found in the rules which are meant to deal with two separate situations. Contract renewal decisions are made in the final year of a contract while notification of non–reappointment must be made 12 months prior to the expiration of the contract. The present case involved notice of non–reappointment and therefore the contract renewal policy was inapplicable.

## A. Property Right

■ In determining whether an alleged deprivation of a property interest amounts to a denial of due process two questions arise. First, whether there is a property interest in the due process sense, and second, what procedural safeguards that interest is entitled to. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ In order to establish that a property interest exists it must be determined that the plaintiff had more than a unilateral expectation in the benefit. Several cases cited by the plaintiff lend support to the position that a property interest can arise in procedures per se. *See Skehan v. Board of Trustees of Bloomsburg State College*, 590 F.2d 470 (3rd Cir. 1978).

Assuming for the purposes of this opinion that procedures can be the basis for a property interest the Court concludes on the basis of its ruling on the breach of contract claim that the plaintiff had no property interest in a tenure review, an ad hoc review committee or a seventh terminal year. Any expectation the plaintiff may have had in those procedures or benefits can only be termed as unilateral and can therefore not be classified as a property interest. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

■ Furthermore, the Court is of the opinion that even if the plaintiff had a property interest as claimed, the plaintiff was not deprived of that interest without due process. The question of whether to give the plaintiff notice of non–reappointment was first considered by the defendants in 1978. They evaluated the plaintiff's teaching, scholarship, and services, they asked the plaintiff to submit any information he wished considered, and the defendants also asked the faculty to submit any pertinent information. The decision of the defendants was reviewed by the Executive Committee, an appeal was taken to SARC, the SARC report was considered by then Vice–President Shapiro who conducted his own investigation. Another review of the plaintiff was conducted in 1979 at which the opinions of people outside the University was considered. The Executive Committee again heard the plaintiff's appeal of this review, and finally the Board of Regents twice considered the decision. The plaintiff was never denied an opportunity to present evidence and he was permitted to have people speak on his behalf.

This Court concludes that the plaintiff "had ample opportunity to present his case ... in a manner calculated to achieve a fair result." *Frumkin v. Board of Trustees, Kent State University*, 626 F.2d 19, 21. (6th Cir. 1980).

## B. Liberty Interest

Marwil has a liberty interest in preserving his good name, reputation and professional integrity. *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548. It is Marwil's contention that the expressed reasons for his termination, "Your assertions have been intemperate at best and often unsupported by the evidence," damages his reputation, suggests dishonesty and will do far more than make him "somewhat less attractive to some other employers." A thorough reading of the memo of May 19, 1978 leads this Court to conclude that the plaintiff has not been stigmatized and that his liberty interest has not been infringed.

The memo states that the plaintiff possess "clear strengths as well as weaknesses" and also remarks that the past year was distinguished by the plaintiff's scholarly activity. Most of the review, however, deals with the plaintiff's behavior and the role behavior played in the decision. Clearly, the comments on the plaintiff's behavior are less than complementary but this alone does not establish a due process liberty interest violation.

■ "To constitute a deprivation of liberty the stigmatizing information must be both false ... and made public ... by the offending governmental agency." *Gentile v. Wallen*, 562 F.2d 193, 197 (2d Cir. 1977). This establishes three elements before a

protected liberty interest can exist. The information must be stigmatizing, it must be false, and it must be made public. The plaintiff has failed to satisfy his burden on each of these three elements.

 This Court does not find the memo of May 19, 1978 to be stigmatizing. There are no allegations of illegal or immoral conduct and while the statements may create a disadvantage or an impediment to future employment they do not foreclose the plaintiff's freedom to take advantage of other employment opportunities. *See Board of Regents v. Roth*, 408 U.S. at 574, 92 S.Ct. at 2707; *Mazaleski v. Treusdell*, 562 F.2d 701 (D.C.Cir.1977).

Furthermore, the plaintiff has failed to establish that the remarks were false. On the contrary he admitted in his testimony that he was intemperate, contentious and abrasive at times. In addition, the record clearly supports the conclusions of the performance review of 1978. The plaintiff had become a divisive factor in the Department and his behavior had limited his ability to work in the Department.

Finally, there is no indication that any memos, reports or communications were made public except by the plaintiff himself or in response to plaintiff's assertions in his pursuit of his appellate rights and this lawsuit.

The Court, therefore, concludes that defendants have not improperly deprived Marwil of a liberty interest by the actions taken.

## CONCLUSION

In summary, the plaintiff has failed to establish that the defendants' actions denied him equal protection of the laws or deprived him of due process. In addition, the plaintiff has not satisfied his burden of showing the defendants breached any contractual obligations. Thus the plaintiff's case must be dismissed.