Alan McCONNELL, Plaintiff,

v.

HOWARD UNIVERSITY, Defendant.

Civ. A. No. 85–0298.

United States District Court,
District of Columbia.

Oct. 28, 1985.

Woodley B. Osborne, Friedman & Wirtz, Washington, D.C., for plaintiff.

Francis S. Smith, University Counsel for Administrative and Employment Affairs, Washington, D.C. (Richard P. Thornell, Vice President for Legal Affairs and General Counsel, Howard University, of counsel), for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

Plaintiff was dismissed for "cause" from a tenured professorship at Howard University by its Board of Trustees ("Board") on the ground that he had neglected his professional responsibilities when he refused to continue teaching a mathematics course to which he was assigned.[1] It is undisputed that plaintiff refused to teach the class. Rather, plaintiff contends that his refusal

---

1. "Cause" is defined in the Faculty Handbook of 1969 (operative when plaintiff was granted tenure) as:
    (a) Professional incompetence;
    (b) Neglect of professional responsibilities;
    (c) Personal misconduct that destroys or impairs academic usefulness;
    (d) Violation of limitations referred to in the Academic Freedom Section of this Handbook;
    (e) Violation of University Regulations;
    (f) Medical disability....
*See* Exhibit 30 to Defendant's Memorandum in Support of Motion for Summary Judgment at 11 (Hereinafter, exhibits to Defendant's Memorandum in Support of Motion for Summary Judgment will be cited as "Defendant's Exhibit ___").

was justified by complications growing out of an altercation between plaintiff and a student.[2] Having exhausted administrative remedies prescribed by the Faculty Handbook of the University,[3] plaintiff filed this suit against the University claiming that his dismissal constituted a breach of his employment contract because the University lacked "adequate cause" to dismiss him. In addition, plaintiff charged defamation. He sought reinstatement and compensatory and punitive damages. Defendant moved for summary judgment on August 9, 1985. Plaintiff filed his opposition to that motion on September 6, 1985, and defendant filed a reply memorandum on September 24, 1985.

This matter is appropriate for disposition by summary judgment because the facts developed in documents and extensive depositions and summarized in defendant's statement of material facts are not disputed in any material way. In addition, as contemplated by the contract between plaintiff and the University, the dispute has been addressed in a structured, on-the-record grievance proceeding reviewed by a committee of the defendant's Board of Trustees and acted on finally by that Board pursuant to the University's established process for dealing with the dismissal of tenured faculty.

Upon consideration of the parties' memoranda and the extensive exhibits and affidavits filed in support thereof, the Court by order entered October 4, 1984, granted defendant's motion for summary judgment for reasons to be stated in a memorandum to be filed. This is that memorandum.

## II.

The parties' pleadings establish the following undisputed facts. Plaintiff is white. He received a Ph.D in mathematics from Cornell University in 1965 and in 1971 was appointed as an associate professor of mathematics at Howard University. In 1975 plaintiff was awarded tenure.

Early in the fall semester of the 1983–1984 term, plaintiff advised the students (all of whom were black) in his Elementary Function I course that because Howard students historically performed poorly in mathematics they should reduce their course hours. At a later session of the class, plaintiff renewed this suggestion and pursued the matter further with a story about a monkey that caught its hand in a food jar and lacked the sense to drop the food in order to escape. Later in that class, one of the students, apparently in reaction to these remarks, called plaintiff a "condescending patronizing racist." After class the student refused plaintiff's request to meet with him privately. At the next meeting of the class, the student refused plaintiff's request to explain herself and told him to "go on and teach the course." Plaintiff then asked her to leave the class. Upon her refusal to do so, plaintiff called for University security to remove her from the class, whereupon she was taken to the Office of the Dean for Special Student Services.

In the days that followed these initial events, both plaintiff and the student remained adamant. She refused to apologize for calling him a racist. He refused to resume teaching the class until she either apologized or left the class of her own accord, or the University sustained and enforced his demand that she leave the class. The University apparently made no effort to transfer the student to another section of the course, or otherwise mediate the dispute. It responded to plaintiff's formal complaint[4] with a letter indicating that the Office of Special Student Services had

---

2. See infra at 328–329.

3. Section VI of the University Handbook relates to "Procedures In Dismissals." See discussion infra at 329 et seq. A copy of Section VI is attached as an Appendix; a copy of the full Handbook was attached as Defendant's Exhibit 30.

4. Which by letter of September 13, 1983, charged that the student had slandered him and requested that she be removed from his class. See Letter from Dr. Alan McConnell to Dr. Austin D. Lane, Dean for Special Student Services (September 13, 1983) (Defendant's Exhibit 10).

"concluded that there exists insufficient evidence of a violation of the code of conduct to warrant the institution of a Judiciary Board hearing."[5]

After several informal and formal requests that plaintiff return to teaching the class, a University official initiated a formal proceeding against plaintiff before a Grievance Committee pursuant to Section VI of the Handbook.[6] The Grievance Committee was comprised of senior tenured professors from University departments other than mathematics. The letter providing notice of the grievance proceeding charged plaintiff with neglect of professional responsibilities and indicated that the proceeding was convened "to formally conduct an inquiry as to your fitness to remain as a member of the faculty of the College of Liberal Arts...."[7]

After formal hearings conducted October 22 and 24, 1983, that Grievance Committee found that plaintiff had refused to teach his class but found that he was not guilty of neglecting his professional responsibilities because, among other things, the University had not attempted to mediate. *See* December 21, 1983 Report of the College of Liberal Arts Grievance Committee at 6–7 (Defendant's Exhibit 16). In addition, a majority of the Grievance Committee pointed to the necessity of "professional authority inherent in the teacher-student relationship." *Id.* at 7.

Pursuant to the procedure prescribed by Section VI of the Faculty Handbook, the Grievance Committee report was transmitted to the University President, who then presented the case to the University Board of Trustees. The Board, in turn, referred the case to a three person Special Committee. That committee requested, received, and reviewed, *inter alia,*[8] a report from the Grievance Committee which summarized its findings and recommendations.[9] The Special Committee concluded, after "a thorough and exhaustive review of the record of the case," that plaintiff was guilty of neglect of his professional responsibility and recommended that he be dismissed.[10] The Board approved the recommendation apparently without discussion, and plaintiff was so notified by a letter dated June 8, 1984.[11] That letter informed plaintiff that:

the Board of Trustees of Howard University, at a duly constituted meeting held on June 2, 1984, pursuant to a review of the record of your grievance hearing, found you to be guilty of having neglected your professional responsibilities. The Board voted therefore, by virtue of its authority, that you be terminated from service at the University as of June 2, 1984.

### III.

The contract allegedly breached by defendant is embodied in the Howard University Faculty Handbook. The parties agree that it provides for dismissal of a tenured professor for cause and includes as one cause, "Neglect of professional responsibilities." Constituting the contract on which plaintiff relies, the Handbook also establishes a formal administrative process (in-

---

5. Letter from Dr. Austin D. Lane, Dean for Special Student Services, to Dr. Alan McConnell (September 16, 1983) at 1 (Defendant's Exhibit 14).

6. *See* discussion *infra* at 329 *et seq; see also* Defendant's Exhibit 30.

7. Letter from Robert L. Owens, III, Dean of the College of Liberal Arts, to Dr. Alan McConnell (September 22, 1983) (Defendant's Exhibit 15).

8. Correspondence between Special Committee members indicates the Special Committee also reviewed transcripts of the Grievance Committee proceedings. *See, e.g.,* Letter from Dr. James F. Tucker to Dr. Frederick L. Stone (May 21, 1984); Letter from Dr. James F. Tucker to the Honorable Gabrielle K. McDonald (May 18, 1984) (Defendant's Exhibits 24, 25).

9. *See* April 5, 1984 Report of College of Liberal Arts Grievance Committee (Defendant's Exhibit 21).

10. *See* Report of the Special Grievance Committee (June 2, 1984) (Defendant's Exhibit 26).

11. Letter from Owen D. Nichols, Secretary of the Board of Trustees, to Alan McConnell (June 8, 1984) (Defendant's Exhibit 28).

cluding a hearing) for dismissals of faculty members. Section VI–E. of the Handbook provides that after a hearing by a Grievance Committee:

### E. CONSIDERATION BY THE BOARD OF TRUSTEES

The Dean shall transmit the full report of the Grievance Committee and its recommendation to the President for presentation to the Board of Trustees or its Executive Committee. If the Board of Trustees or its Executive Committee chooses to review the case, its review shall be based on the record of the hearing. The decision of the Board of Trustees shall be final.

Plaintiff contends that the court should treat this as a breach of contract case and that "neglect of professional responsibilities" is an ambiguous, undefined term. Plaintiff thus contends that the Court should give no weight to the University's administrative process prescribed by the Handbook/contract and should conduct a trial *de novo* to resolve whether plaintiff did neglect his professional responsibilities or, as the Grievance Committee apparently viewed the matter, professionally defended professorial authority.

Defendant, by contrast, emphasized the University's well-developed grievance process in which the Grievance Committee holds hearings, makes a record and renders decisions, which decisions are subject to (1) review on the administrative record and (2)

the ultimate decision of the Board of Trustees.[12] *See* Faculty Handbook Section VI (attached as an Appendix to this memorandum). Defendant suggests that the Court should treat the Board as it would treat an administrative agency and defer to the University's decision unless it was arbitrary and capricious, pointing out that courts have often adopted such a deferential attitude toward similar college or university decisions.[13]

There are obviously two (or more) sides to the controversy between the plaintiff, the student, and the University. There is nothing ambiguous, however, about the obligation of a professor to teach assigned classes and plaintiff's failure to teach his class is undisputed. Defendant cites persuasive authority (albeit from other jurisdictions) for the proposition that a refusal to perform a prescribed duty, such as teaching a class, is a valid ground for the dismissal of a tenured professor. *See Smith v. Kent State University*, 696 F.2d 476 (6th Cir.1983); *Stastny v. Board of Trustees of Central Washington University*, 32 Wash.App. 239, 647 P.2d 496, 502, 506–07 (1982), *cert. denied*, 103 S.Ct. 1528 (1983).

■ Plaintiff does not dispute that his contract put him at risk of termination for cause which included neglect of professional responsibilities. Nor does he proffer material evidence that he was deprived of procedural rights guaranteed by the con-

---

**12.** Plaintiff also contends that he was entitled to an additional hearing by the Board of Trustees and a more detailed statement of its reasons. The Special Committee's recommendation, approved by the Board, was based on its "thorough and exhaustive review of the record of the case," which record included transcripts of the hearings before the Grievance Committee and the Grievance Committee's recommendation. *See supra* at 329. The grievance procedures detailed in the Handbook/contract do not require the Board to state in detail the reasons given for its decisions made after review of the record developed by the Grievance Committee.

**13.** *See e.g., Gray v. Canisius College of Buffalo*, 430 N.Y.S.2d 163, 166, 76 App.Div.2d 163 (N.Y. 1980); *see also Stebbins v. Weaver*, 537 F.2d 939, 943 n. 2 (7th Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *See-*

*feldt v. Board of Trustees of the University of the District of Columbia*, 487 F.Supp. 230, 233 (D.D. C.1979). Many of the cases that might be cited in support of such deference are not strictly apposite, as they involved *state* institutions of higher education, *see Krotkoff v. Goucher College*, 585 F.2d 675, 681–2 (4th Cir.1978), and "Howard's essentially private status must be recognized. It is not to be treated as a state university." *Sanford v. Howard University*, 415 F.Supp. 23, 29 (D.D.C.1976), *aff'd.* 549 F.2d 830 (D.C.Cir.1977). Nonetheless, the cases generally support the proposition, discussed more extensively below, that a federal court should hesitate before significantly intruding in the administration of university affairs, particularly in a three-cornered dispute between a professor, a student and a university.

tract. *Cf. Greene v. Howard University*, 412 F.2d 1128 (D.C.Cir.1969). Plaintiff also does not dispute that he refused to teach the class as directed by his superiors. It seems incontrovertible that the refusal to teach a class (flouting direct administration orders in the process) must constitute a failure to meet a professional responsibility. Plaintiff argues, in effect, however, as the Grievance Committee essentially found, that he should have been *excused* for his failure to meet one professional responsibility (teaching the class assigned to him) because he was attempting to meet another professional responsibility (preserving professorial authority).

Plaintiff points to no provision of the contract giving him any legal right to be excused from performance of his teaching duty. He points to nothing in his contract and proffers no evidence of any University practice requiring the University to attempt to mediate a dispute between a professor and a student before beginning dismissal proceedings.

■ Moreover, the single contract between plaintiff and the University evidences acquiescence by the plaintiff in both the definition of cause for dismissal and the University's procedure for effecting a dismissal. That Handbook/contract (1) provided for dismissal for cause, (2) defined cause to include neglect of professional responsibility, (3) established a hearing and review process for dismissal cases, and (4) made the dismissal decision of the Board of Trustees "final." The plaintiff having agreed to accept employment on those terms, this Court should uphold the Board's decision and grant defendant's motion for summary judgment, unless the Board's decision was arbitrary, or plaintiff has proffered evidence of improper motivation or irrational action. Given the undisputed facts and the case law, the Board did not behave in an arbitrary fashion when, after a Grievance Committee hearing had

produced an administrative record, the Board determined that plaintiff's refusal to resume teaching his class (in contravention of direct orders) constituted a neglect of plaintiff's professional responsibilities which it chose not to excuse. As in *Williams v. Howard University*, 528 F.2d 658, 660–61 (D.C.Cir.1976), *cert. denied*, 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 123 (1976), plaintiff here has failed to "present any facts to show improper motivation or irrational action on the part of Howard [and that failure] vitiates any claim of gross arbitrariness for which courts may grant relief in a private setting." *See Williams, supra,* 528 F.2d at 660–61; *see also Giles v. Howard University*, 428 F.Supp. 603, 605 (D.D.C.1977).

### IV.

■ In view of the foregoing, it is unnecessary to belabor plaintiff's defamation claim. Plaintiff points to what he suggests was undue haste with which charges were pressed against him after he refused to teach his section of Elementary Functions I unless the offending student apologized or was removed from his class. He does not, however, point to any false statement of *fact*,[14] as distinguished from opinion. Statements made by University personnel to the effect that actions undisputedly taken by plaintiff constituted a neglect of his professional duties were in essence "evaluative opinions" that in these circumstances will not support an action for defamation. *See* Prosser and Keeton on Torts § 113A at 814 (W. Keeton 5th ed. 1984):[15]

The evaluation opinion only is published when the publisher makes a value judgment about another or another's conduct—e.g. that it was discreditable, dishonorable, or corrupt—on the basis of true informational background either supplied to, assumed to be known by, or available to those receiving the communi-

---

**14.** It is undisputed that plaintiff refused to teach his class as directed. As discussed in the preceding section, the Board did not erroneously determine that plaintiff had thereby neglected his professional duties.

**15.** *See generally Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984) *(en banc), cert. denied,* —— U.S. ——, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

cation.... The evaluation opinion has often been regarded as false if either the defendant did not entertain the opinion expressed and was misstating his own state of mind or if a reasonable and fair-minded person could not have entertained the derogatory opinion on the basis of the information upon which he relied.

As implied by the discussion in the preceding section, the evaluative opinions expressed by University personnel were not susceptible to the characterization stated in the last sentence of the above quoted paragraph.

■ Even if plaintiff were able to point to false, allegedly defamatory statements made by defendant's agents, he does not effectively dispute defendant's claim that its statements, actions and decisions with respect to this dispute were at least qualifiedly privileged. *See Greenya v. George Washington University*, 512 F.2d 556, 563 (D.C.Cir.1975), *cert. denied*, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975). Plaintiff proffers no evidence which would support a *prima facie* case of malice that would overcome those privileges.[16] Accordingly, the defamation claim must also fall to defendant's motion for summary judgment.

For all these reasons, the October 4, 1985 Order granted defendant's motion for summary judgment.

## APPENDIX
### Howard University Handbook
### Revised Feb. 1, 1969

## CONTENTS

Page

FOREWORD
CAMPUS MAP ....................................................... 22
HISTORY OF THE UNIVERSITY ..................................... 3
ORGANIZATION AND ADMINISTRATION OF THE UNIVERSITY ....... 3
    University Council of Administration ... (See descriptive item in Appendices)
    University Senate ..................... (See descriptive item in Appendices)
    Council of the University Senate ...... (See descriptive item in Appendices)
PRELIMINARY PROCEDURES AND GENERAL INFORMATION
    Employment Procedures ............................................. 4
    Salary Payments ................................................... 4
    Academic Year .................................................... 4
    Attendance at Official University Ceremonies ......................... 4
    The American Association of University Professors .................... 5
    The Faculty Women's Club .......................................... 5
    The Howard University Faculty Wives Club .......................... 5
    National Honor Societies and Professional Associations ................ 5
    Housing .......................................................... 5
    Trustee Regulation on Faculty Voting ............................... 6
EMPLOYMENT POLICIES
    Academic Freedom ................................................. 6
    Academic Tenure Regulations ....................................... 7
RESEARCH AND PUBLICATIONS
    Advertising and Publicity .......................................... 17
    Grants-in-Aid ..................................................... 18
    Conflicts of Interest ............................................... 18
    Policies and Procedures in Prevention of Conflict of Interest Situations     20

16. Plaintiff's vague and conclusory suggestion that "[o]ne cannot help but conclude that there is more to this than meets the eye," Plaintiff's Statement of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment at 19, is admittedly provided a modicum of support by the Grievance Committee's assertion that "[n]o one representing the University seemed inclined to do anything except to prefer charges against Dr. McConnell." Grievance Committee Report (Defendant's Exhibit 16) at 7. Nonetheless, that suggestion is insufficient to present a *prima facie* case of malice by materially traversing (1) the undisputed facts supporting the Board's opinion that plaintiff neglected his professional duties and (2) defendant's exhaustive documentation of the steps taken by officials in this matter in accordance with University procedures.

Page

FACULTY WELFARE BENEFITS
    Compensation for Injury ........................................... 21
    Compensation for Unemployment .................................. 21
    Federal Social Security Plan ....................................... 21
    First Aid .......................................................... 23
    Group Hospitalization and Group Surgical-Medical Service ............ 23
    Group Life Insurance Program ...................................... 23
    Howard University Employees Federal Credit Union ................... 24
    Purchase of U.S. Savings Bonds .................................... 24
    Retirement Allowances ............................................ 25
    T.I.A.A. Deferred Annuity Contracts ............................... 26
    Salary or Annuity Option .......................................... 26
    College Retirement Equities Fund .................................. 27
    Total Disability Benefits Plan ...................................... 28
    Tuition Allowances ................................................ 29
REGULATIONS AND PROCEDURES RELATING TO TRAVEL
    Travel Advances ................................................... 29
    Travel Reimbursements ............................................ 30
    Travel Reports .................................................... 30
    Local Travel and Use of Personal Automobiles ...................... 31
    Accidents ......................................................... 31
EDUCATIONAL, CULTURAL AND RECREATIONAL RESOURCES
    Andrew Rankin Memorial Chapel .................................... 31
    Cultural Series .................................................... 32
    The Gallery of Art ................................................ 32
    Plays and Concerts ................................................ 32
    Founders Library .................................................. 32
    Other Libraries on Campus ......................................... 32
    Recreation ........................................................ 33
    University Publications ............................................ 33
PHYSICAL FACILITIES
    Bookstores ....................................................... 33
    Post Office ........................................................ 33
    Food Services ..................................................... 34
    Campus Parking Facilities ......................................... 34
    Utilization of Physical Facilities ................................... 35
APPENDICES
    University Council of Administration ............................... 35
    The University Senate ............................................. 36
    The Council of the University Senate ............................... 37
    Steering Committee of the Council of the University Senate .......... 41
GENERAL

SECTION VI: *PROCEDURES IN DISMISSALS:*

A. PRELIMINARY PROCEEDINGS

1. When the fitness of a faculty member is under question, appropriate administrative officers shall discuss the matter with him directly. If a mutually satisfactory resolution does not resolve, the matter shall be referred to the Grievance Committee of the school concerned. The Dean of the appropriate school or college designate shall prepare a statement setting forth the grounds proposed for dismissal and the charges of misconduct, such statement to be made known to the Grievance Committee for its information.

2. This statement shall then be incorporated in a letter from the Dean to the faculty-elected Grievance Committee meeting at a specified time and place, sufficient time being allowed for the preparation of his defense, such period not to be less than 15 days. The faculty member shall be informed by reference to published regulations of the procedural rights that will be accorded to him, such as his right to counsel. In particular, the procedures specified in paragraph "C" below shall be made known to him. The faculty member shall

reply in writing, not less than one week before the date set for the hearing to the charges contained in the Dean's letter.

3. Grievance Committee: Each of the several schools and colleges shall elect at the usual time for committee elections a Grievance Committee whose function it shall be to fulfill the requirements as set out in Section VI of the Employment Policies dealing with dismissals. This committee shall be composed of five members of the faculty on indefinite tenure and shall be elected for one year. Members of the Grievance Committee should disqualify themselves: 1) if they belong to the same department as the aggrieved party, or 2) if there is any possibility of conflict of interest, or 3) if there arises a question of prejudice. These matters shall be decided by the Grievance Committee.

## B. SUSPENSION OF THE FACULTY MEMBER PENDING A HEARING

Suspension of a faculty member pending a hearing with a statement of reasons recommended by the Dean and approved by the President's Office may be imposed only if unusual circumstances warrant it, and shall be with pay.

## C. GRIEVANCE COMMITTEE PROCEEDINGS

1. The Grievance Committee shall proceed by considering the statement of grounds for dismissal and the charges of misconduct already stated in the Dean's letter, and the faculty member's response. The hearing shall be in private unless the faculty member requests otherwise and the hearing committee concurs in the request. If any facts are in dispute, the testimony of witnesses and other evidence concerning the charges shall be received.

2. The Dean may attend the hearings and participate in the hearing. He may designate a representative to assist in developing the case; but the committee shall determine the order of proof, control the conduct of proceedings including the questioning of witnesses.

3. The faculty member shall have the right of representation by counsel of his choice, whose functions are to be similar to those of the representative chosen by the Dean. The faculty member or his counsel and the representative designated by the Dean shall have the right, within reasonable limits, to question all witnesses who testify orally. In the case when a witness does not appear, the identity of the witness as well as his statement shall be disclosed, to the faculty member. Subject to these safeguards, statements may, when necessary, be taken outside the hearing and reported to it. All of the evidence shall be duly recorded. The record of the hearing shall be available to the faculty member. If a charge of professional incompetence is involved, testimony shall include that of teachers and other scholars in his discipline. The hearing procedures shall not necessarily adhere to formal rules of court procedure. In the event a faculty member fails to appear for a scheduled hearing, the Grievance Committee shall proceed with the hearing in his absence and shall reach its conclusions on the basis of the evidence presented.

## D. CONSIDERATIONS BY THE GRIEVANCE COMMITTEE

On the basis of the hearing, the Grievance Committee shall reach its decisions in conference after giving opportunity to the faculty member or his counsel and the Dean or his representative to summarize orally before it, and to submit written briefs, if the committee desires. The committee shall then arrive at explicit findings with respect to each of the grounds for dismissal and formulate its decision for or against removal of the faculty member. A transcript of the hearing may be used during this decision process, if needed. The Dean and the faculty member shall be notified in writing of the findings of fact and decision. Each shall receive, as promptly as possible, and at the same time, a copy of the record of the hearing. Notice of the findings of fact and decision shall be withheld until consideration has been given to the case by the Board of Trustees.

E. CONSIDERATION BY THE BOARD OF TRUSTEES

The Dean shall transmit the full report of the Grievance Committee and its recommendation to the President for presentation to the Board of Trustees or its Executive Committee. If the Board of Trustees or its Executive Committee chooses to review the case, its review shall be based on the record of the hearing. The decision of the Board of Trustees shall be final.