HOWARD UNIVERSITY, et al., Appellants,

v.

Marie L. BEST, Appellee.

No. 86–1062.

District of Columbia Court of Appeals.

Argued April 26, 1988.

Decided Aug. 22, 1988.

---

Nolan Atkinson argued the case for appellants. Richard P. Thornell and Francis S. Smith, Washington, D.C., were on the brief, for appellants.

John M. Clifford, with whom Stephen A. Trimble, Washington, D.C., was on the brief, for appellee.

Before TERRY, ROGERS and STEADMAN, Associate Judges.

ROGERS, Associate Judge:

This is the second appeal arising out of the employment contract of appellee Dr. Marie L. Best with appellant Howard University. In our prior opinion, we remanded the case to the Superior Court for retrial of Dr. Best's claims of indefinite tenure, sex discrimination, and intentional infliction of emotional distress. We affirmed the trial court's directed verdict in favor of Dr. Best, holding that the University had breached its contract with her by failing to provide timely notice of nonrenewal, but we remanded for findings on the proper remedy for late notice. We also remanded the case for trial on Dr. Best's claim of indefinite tenure based on the Faculty Handbook provision for indefinite tenure upon reappointment after a "previous appointment," the trial court having dismissed this tenure claim without prejudice. *Howard University v. Best*, 484 A.2d 958, 990 (D.C.1984) (*Best I*). Following a retrial, the jury found in favor of Dr. Best on her claim of indefinite tenure based on a "previous appointment," and, alternatively, found that she was entitled to reappointment for three years without indefinite tenure as a result of the University's failure to give her the required one-year notice of non-renewal of her previous three-year appointment. The jury awarded her damages of one million dollars on the indefinite tenure claim and $155,000 on its alternative finding of a three-year reappointment without indefinite tenure. A judgment was entered for Dr. Best awarding her one million dollars plus interest and costs.

On appeal the University contends principally that, as a matter of law, Dr. Best failed to present sufficient evidence of the University's custom and practice regarding the granting of indefinite tenure by reappointment after a "previous appointment." The University also contends that there was no evidence to support the jury's finding that Dr. Best was entitled to a three year appointment as a result of its late notice breach of her contract; at most, the University maintains, she was entitled to a

statement of reasons for her non-renewal and to damages measured by the lateness of the notice, *i.e.*, six months pay.[1]

We hold that Dr. Best failed to present sufficient evidence of the University's custom and practice regarding a "previous appointment" and, therefore, reverse the judgment based on a finding that she was entitled to indefinite tenure as of July 1, 1976. We further hold that there was sufficient evidence from which the jury could find that Dr. Best had a reasonable expectation of a reappointment for three years without indefinite tenure upon receiving late notice of the nonrenewal of her three year probationary appointment, and, accordingly, affirm the judgment based on the alternative finding.

## I.

A complete recitation of Dr. Best's negotiations and employment with the University, as well as the events giving rise to this lawsuit, appears in *Best I, supra*, 484 A.2d at 965–66. Before considering the University's contentions, we address the threshold issue raised by Dr. Best of whether the University preserved its right to appeal the verdict in her favor based on her "previous appointment" theory of entitlement to indefinite tenure. We also review the holding in *Best I* on what Dr. Best was required to prove with regard to the University's custom and practice. Thereafter, in Parts II and III, we address the University's contentions on appeal.

## A.

Dr. Best contends that the University was not entitled to move for judgment notwithstanding the verdict on the grounds of insufficiency of the evidence on the previous appointment theory because the University had failed to move for a directed verdict on this issue at the close of all the

evidence. Although the University did move for a directed verdict at the close of all the evidence, Dr. Best argues that the University is precluded from raising this theory on appeal because Super.Ct.Civ.R. 50(b) requires that in order to move for judgment notwithstanding the verdict, a party must first move for a directed verdict on "the precise claim made in the motion for judgment n.o.v....." *U.S. Industries, Inc. v. Blake Construction Co.*, 217 U.S. App.D.C. 33, 42, 671 F.2d 539, 548 (1982).

■ Super.Ct.Civ.R. 50(a) provides that "[a] motion for directed verdict shall state the specific grounds therefor." If such motion is denied, a party is then entitled to move within ten days of the judgment "to have the verdict and any judgment entered thereon set aside and to have judgment entered *in accordance with his motion for a directed verdict.*" Super.Ct.Civ.R. 50(b) (emphasis added). Therefore, the failure to include a particular ground in a motion for directed verdict will bar the consideration of this ground in a subsequent motion for judgment notwithstanding the verdict. *Seven Provinces Ins. Co. v. Commerce & Indus. Ins. Co.*, 65 F.R.D. 674, 686 (W.D. Mo.1975). Dr. Best contends that the University requested a directed verdict on the late notice theory but failed to make a like motion with respect to the previous appointment theory and that it has therefore waived its right to object to the sufficiency of her evidence.

■ "[T]his court has placed a literal construction on the wording of Rule 50(b)." *Gleason v. L. Frank Co.*, 328 A.2d 96, 98 (D.C.1974). The failure to move for a directed verdict "'precludes a party from questioning on appeal the sufficiency of the evidence.'" *District of Columbia v. Hickey*, 150 A.2d 463, 465 (D.C.1959) (quoting *Krupsaw v. W.T. Cowan, Inc.*, 61 A.2d 624, 626 (D.C.1948)). However, we have not yet

---

1. The University also appeals the judgment on the grounds that (1) Dr. Best's evidence of custom and practice was incompetent and inadmissible, (2) the verdicts were based on improper hearsay, and (3) the University was denied a fair trial because of highly prejudicial evidence presented to the jury. The jury also found in favor of Dr. Best on her sex discrimination claim and awarded her ten dollars in damages. The University has abandoned its appeal of the judgment based on the verdict for Dr. Best on this ground. Dr. Best voluntarily dismissed her claim of intentional infliction of emotion distress after the trial judge entered a directed verdict for the University.

determined how specific a motion for directed verdict must be in order to preserve the issue for a motion for judgment notwithstanding the verdict and for appeal.

▪ There are two purposes behind the requirement in Rule 50(b) that a party moving for judgment notwithstanding the verdict first move for a directed verdict. The first purpose is to preserve the sufficiency of the evidence as a question of law. *Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1428 (9th Cir.1986). A subsequent motion for judgment notwithstanding the verdict allows the trial court to review, as a matter of law, its decision not to direct a verdict rather than by engaging in a reexamination of the facts found by the jury. *Id.* at 1428–29. The second purpose behind the requirement is to call the attention of the opposing party to the alleged deficiency in the evidence at a point in the trial where that party may cure the defect by presentation of further evidence. *Id.* at 1429; *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1346 (9th Cir.1985); *Wall v. United States*, 592 F.2d 154, 160 (3d Cir.1979); *Walden v. United States Steel Corp.*, 567 F.Supp. 1443, 1446 (N.D.Ala.1983), *aff'd in part*, 759 F.2d 834 (11th Cir.1985).

▪ In the instant case, counsel for the University moved for a directed verdict at the close of all the evidence, stating:

Finally, Your Honor, with respect to the alleged breach of contract claim, here I think now at the close of all the evidence especially the university's evidence going to custom and usage, I think it is clear that it does not present a jury issue that Dr. Best's timely notice of nonrenewal did not entitle her to an automatic reappointment which would give her tenure. I think that the plaintiff has failed to show any contrary custom and usage. The few incidents submitted by the plaintiff in support of her case were sufficiently explained by the university's wit-

nesses and by the testimony going to custom and usage.

We would submit, Your Honor, that the plaintiff has failed to show that she would be entitled to any tenure by virtue of that late notice of nonrenewal *and similarly she would not have tenure by virtue of reliance on Dean Robinson's representations which she says she relied upon.* [Emphasis added]

We hold that the University's motion was sufficient to put Dr. Best on notice of the alleged deficiency in her proof. In moving for a directed verdict, "technical precision" is not required. *Cortez v. Life Ins. Co. of North America*, 408 F.2d 500, 503–04 & n. 3 (8th Cir.1969); 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2533, at 580 (1971). Counsel for the University stated that he was moving for a directed verdict because Dr. Best had failed to offer sufficient proof of custom and practice which would show that she was entitled to indefinite tenure by virtue of reliance on Dean Robinson's representations. Dr. Best relied on her negotiations with Dr. Robinson as part of the extrinsic evidence she presented in support of her claim of tenure based on a "previous appointment"; that evidence was irrelevant, and Dr. Best did not purport to rely on it, to prove her claim to tenure by reason of late notice of non-renewal. Thus, although counsel for the University might have elaborated more on this point, we are satisfied that his motion was sufficient to preserve the issue of the sufficiency of Dr. Best's evidence of custom and practice on the previous appointment theory.

### B.

▪ In the trial court, Dr. Best presented two alternative theories in support of her claim that she was entitled to indefinite tenure with the University. Under her first theory, Dr. Best asserted that by the terms of the Howard University Faculty Handbook Section III(C)(3)(c),[2] she received

---

2. Section III(C)(3)(c) of the Faculty Handbook provides:

Associate Professors and Professors shall be appointed with indefinite tenure, except that

an Associate Professor without *previous appointment* at the University shall be appointed for a period of three years. If reappointed, he will be given indefinite tenure. In exception-

indefinite tenure on July 1, 1976, because she had held a "previous appointment" at the University, and that, therefore, upon commencement of her reappointment on July 1, 1976, she automatically acquired indefinite tenure. She maintained that her ninety-day, part-time, non-teaching appointment from April 1 to June 30, 1976, was a "previous appointment" within the meaning of the Faculty Handbook Section III(C)(3)(c). *Best I, supra,* 484 A.2d at 974–76. Dr. Best's second theory was that she achieved indefinite tenure on July 1, 1979, because, contrary to Section III(C)(2) of the Handbook,[3] the University failed to serve notice of her nonrenewal one year prior to the expiration of her three-year contract. *Id.* at 968–74.

Dr. Best argues that *Best I* did not require her to present evidence of custom and practice in support of her first, or "previous appointment," theory. On the contrary, Dr. Best argues that *Best I* resolved the issue of evidentiary sufficiency on this theory in her favor. She reads our opinion as having held that her evidence was sufficient to create an issue of fact for the jury and that therefore the University's claim that the evidence is insufficient is frivolous. We cannot agree.

In *Best I,* we held that the critical issue with respect to Dr. Best's "previous appointment" theory was "the meaning of the words 'previous appointment.'" 484 A.2d at 975. At the outset of our opinion, we stated that the objective view of contract interpretation adopted in this jurisdiction requires, in the context of University employment contracts, that the custom and practice of the University be taken into account in determining what were the reasonable expectations of persons in the posi-

tion of the contracting parties. *Best I, supra,* 484 A.2d at 967 (citing *Greene v. Howard University,* 134 U.S.App.D.C. 81, 88, 412 F.2d 1128, 1135 (1969)). After reviewing the provisions of the Faculty Handbook and summarizing the testimony presented at trial, we held that the trial court had properly ruled that there was a disputed issue of fact concerning the meaning of the two appointments. *Id.* at 976. Thus we stated:

> The disputed issue is the meaning of the words "previous appointment." The employment papers for Dr. Best's July 1, 1976 appointment refer to a "reappointment," and another way to frame the issue is, what was the nature of her first (April 1 to June 30, 1976) appointment?

> \* \* \* \* \* \*

> But since there are two reasonable interpretations of the phrase "previous appointment" *and resort must be had to extrinsic evidence,* the issue should have been presented to the jury.[4]

> \* \* \* \* \* \*

> We ... remand the case for a new trial on the issue of [Dr. Best's] status as a tenured or non-tenured faculty member....

*Id.* at 975, 976 (emphasis added). We observed earlier in the opinion, moreover, that

> [i]t is clear, however, that the disputed issue between [Dr. Best and the University] cannot be resolved *without reference to the University's custom and practice for making reappointments and granting indefinite tenure generally* as well as its custom and practice specifically, if any, when a faculty member whose reappointment would result in

---

al cases, a new appointee to the rank of Associate Professor or Professor may be appointed with indefinite tenure. [Emphasis added] *See Best I, supra,* 484 A.2d at 991 (Appendix).

3. Section III(C)(2) of the Faculty Handbook provides in pertinent part:

Subject to the provisions below, a regular full-time member of the faculty shall be notified in writing on or before June 30, preceding his final (i.e. maximum), probationary year that he will be granted indefinite tenure

or that his regular full-time service will be terminated at the completion of that year. *See Best I, supra,* 484 A.2d at 991 (Appendix).

4. Our citation at this point to *Howard University v. Durham,* 408 A.2d 1216, 1217 (D.C.1979), wherein the court addressed a question of contract interpretation, also makes clear that the issue of the sufficiency of Dr. Best's evidence of custom and practice regarding "previous appointment" was not decided in *Best I.*

indefinite tenure receives late notice of non-renewal.

*Id.* at 973 (emphasis added).

Since the only pertinent issue before us in *Best I* was whether the trial court had erred in dismissing without prejudice the "previous appointment" claim, we did not need to address, nor did we purport to resolve, the issue of the sufficiency of Dr. Best's evidence. The trial court had dismissed her claim based on this theory, *see Best I, supra,* 484 A.2d at 966, after directing a verdict in her favor on her late notice theory, and consequently the trial court did not rule on the University's objections to the relevance, competency, or admissibility of Dr. Best's evidence, and there were no rulings for this court to review. In view of the dismissal of this duplicative theory of indefinite tenure before the case had been submitted to the jury, there was no occasion in *Best I* for either the trial court or this court to consider whether Dr. Best's evidence was legally sufficient to establish the University's custom and practice in construing the Faculty Handbook term "previous appointment." Rather, as the italicized language quoted above makes clear, we held only that the phrase "previous appointment" was susceptible of two reasonable interpretations and that therefore extrinsic evidence was necessary to a proper interpretation of this provision of the Faculty Handbook. Dr. Best was therefore required to present evidence of the University's custom and practice in construing the phrase "previous appointment" in order to prevail on this theory.

Notwithstanding Dr. Best's interpretation of *Best I* in this appeal, the record of the trial following our remand indicates that the parties and the trial court clearly understood that custom and practice evidence was necessary under either of Dr. Best's theories of indefinite tenure. The

parties proposed instructions on the relevance of evidence of the University's custom and practice to both of Dr. Best's tenure theories, and the trial court so instructed the jury at several points during the final instructions. Dr. Best did not voice an objection to the court's proposed instructions on custom and practice during the discussion of the trial court's proposed instructions, and she did not express any objection after the court had instructed the jury.[5] Also included in Dr. Best's proposed instructions was an instruction that, with respect to her "previous appointment" theory, where a necessary contract term does not appear in the written employment agreement, it can be supplied by determining the reasonable expectations of the parties based on the surrounding circumstances. The thrust of this instruction was given to the jury. *Best I,* as well as *Greene v. Howard University, supra,* leaves no doubt that "the surrounding circumstances" required proof of "the hiring policies and practices of the University as embodied in its employment regulations and customs." *Greene v. Howard University, supra,* 134 U.S.App.D.C. at 88, 412 F.2d at 1135. Dr. Best's contract documents do not explicitly state the disputed proposition, namely, that Dr. Best had acquired indefinite tenure on July 1, 1976, because her ninety-day prior appointment was a "previous appointment" under the Faculty Handbook. Finally, in closing arguments to the jury the parties specifically disputed whether Dr. Best had shown that the University's custom and practice entitled her to indefinite tenure upon reappointment because of a "previous appointment."

## II.

▇▇▇ The University contends on appeal that the trial court erred in failing to

---

5. After instructing the jury, the trial court inquired if counsel had any objections to the instructions. The University's counsel stated two objections, which were overruled. Dr. Best's counsel stated that her exceptions to the jury instructions given by the court were reflected in the instructions she had submitted to the court. Since Dr. Best's proposed instructions on custom and practice did not differ in material re-

spect from those given by the trial court, we can only conclude that she did not object to the court's instructions on her burden to prove the University's custom and practice as to the meaning of the term "previous appointment" in the Faculty Handbook when she was negotiating her employment contract with Dean Robinson. Nothing in the record suggests to the contrary.

grant its motion for judgment notwithstanding the verdict because the evidence offered by Dr. Best in support of her "previous appointment" theory was legally insufficient to support the verdict. Specifically, the University maintains that Dr. Best failed to establish that it was the University's custom and practice to grant indefinite tenure upon reappointment to professors whose only previous appointment was a part-time non-teaching appointment lasting less than the standard three-year probationary period. We agree.

The standard for establishing a custom and practice, or custom and usage as it is also called, is well established in this jurisdiction. In order for a custom and practice to be binding on the parties to a transaction, it must be proved that the custom is definite, uniform, and well known, and it must be established by "clear and satisfactory evidence." *Weaver v. Du Pont,* 119 A.2d 716, 717 (D.C.1956); *Goldberg v. Strouck,* 76 A.2d 785, 787 (D.C.1950); *Lucas v. Auto City Parking Co.,* 62 A.2d 557, 559 (D.C.1948); *McDevitt v. Waple & James, Inc.,* 34 A.2d 39, 40 (D.C.1943); *United States Shipping Bd. Emergency Fleet Corp. v. Levensaler,* 53 App.D.C. 322, 326, 290 F. 297, 301 (1923) (citations omitted). In *Levensaler* the court relied on *Chicago, M. & St. P. Ry. v. Lindeman,* 143 F. 946, 949 (1906), where the Eighth Circuit Court of Appeals stated that "a binding custom must be certain, definite, uniform, and known, or so notorious that it would have been known to any person of reasonable prudence who dealt with its subject with the exercise of ordinary care." The reason for such a high standard arises from the fact that

> [a] custom has the force of law, and furnishes a standard for the measurement of many of the rights and acts of men. It must be certain or the measurements by this standard will be unequal and unjust.

*McDevitt v. Waple & James, Inc., supra,* 34 A.2d at 40 (quoting *Lindeman, supra,* 143 F. at 949). As one court has noted in a case involving a non-tenured professor seeking tenure based on the university's custom, "[c]ustom is an area of contract law through which the courts must travel prudently. Only upon a clear showing of custom, nigh universally understood, should a court impose obligations based on custom." *Marwil v. Baker,* 499 F.Supp. 560, 575 (E.D.Mich.1980).[6]

The jury found that Dr. Best was entitled to indefinite tenure on her "previous appointment" theory. Although the jury was not explicitly instructed on the meaning of the term "custom and practice," but only told that Dr. Best had the burden to prove it by a preponderance of the evidence, the jury apparently believed Dr. Best's assertion that, in view of the evidence that the University did not always require a faculty member to serve a three year probationary period prior to obtaining indefinite tenure, it was reasonable for Dr. Best to rely upon Dean Robinson's representations that she would receive indefinite tenure upon her reappointment on July 1, 1976. A review of the evidence before the jury clearly demonstrates, however, that Dr. Best failed to present evidence sufficient to establish the University's custom and practice with regard to granting indefinite tenure to a faculty member who had served only a part-time, non-teaching, non-resident appointment for less than the usual three-year probationary period (and who had not previously had indefinite tenure elsewhere before joining the Howard

---

**6.** *See also Moinester v. Wilson & Co.,* 36 F.Supp. 33, 34 (S.D.N.Y.1940) ("[a] custom involving a contract for life employment is of such unusual and extraordinary character that a great burden is placed upon the plaintiff to establish it."). *Cf. McKinney v. Armco Steel Corp.,* 270 F.Supp. 360, 363 (W.D.Pa.1967) (requires testimony of several witnesses). See note 12, *infra.*

We need not address the University's contention that the trial court erred in denying its motion for judgment notwithstanding the verdict because it instructed the jury that Dr. Best's burden of proof was by a preponderance of the evidence. The University proposed an instruction to restrict the scope of judicial review of its decisions on reappointment and indefinite tenure but did not request an instruction that Dr. Best had to prove its custom and practice by clear and convincing evidence. See notes 11 & 12, *infra.* Even under the lower preponderance standard, Dr. Best's evidence was insufficient.

University faculty). Without such evidence the jury had no basis on which to find that Dr. Best had a reasonable expectation at the time of her negotiations with Dean Robinson that she would receive indefinite tenure on July 1, 1976.

As evidence of the University's custom and practice regarding previous appointments resulting in indefinite tenure upon reappointment, Dr. Best relies heavily on the testimony of Dr. Benjamin Cooke, a former tenured professor at the University and former member of the faculty executive committee. However, Dr. Cooke testified only that he had received tenure upon his reappointment as associate professor after serving as lecturer for a single semester. He testified that the dean had told him he had tenure and that it was the University's policy to grant tenure in this manner. Dr. Cooke also gave testimony concerning other members of the faculty who had received tenure in a manner inconsistent with the Faculty Handbook, but in each instance, according to Dr. Cooke's own testimony, the individual received tenure as a result of late notice of non-renewal or by promotion to full professor. Dr. Cooke further conceded that all tenure decisions had to have the ultimate approval of the president and board of trustees of the University. The individuals whose cases he cited had, in fact, received such approval.

Dr. Best also seeks support for her theory in the testimony of Dr. Arlondo Taylor, acting dean of the University's School of Communications, who testified concerning Professor Lawrence Still. Dr. Taylor stated that Still had received indefinite tenure after serving in a part-time capacity as an adjunct professor at the University. However, Dr. Taylor testified unequivocally that Still's tenure, unlike that of Dr. Best, had been approved by the president and board of trustees of the University.

The testimony of Ralph Arline, an instructor of pharmacy at the University and former member of the appointment, promotion, and tenure committee, and Captain Edward Basdekian, then an assistant professor and assistant to Dean Ira Robinson, is similarly unhelpful to Dr. Best in proving the existence at the University of a generally accepted custom and practice relative to faculty members in Dr. Best's position. Arline and Basdekian testified that they understood that Dr. Best's second appointment, on July 1, 1976, was to be with indefinite tenure, but both stated that the basis for their belief was statements made by Dean Robinson to this effect. Their testimony did not address the University's custom and practice. Dr. Best's reliance on the testimony of Dr. Kenneth Scott, a member of the faculty of the College of Pharmacy for twenty-six years, is puzzling since he testified that it would have been unreasonable for Dr. Best to rely on the dean's oral representations of indefinite tenure and that the approval of both the president and the board of trustees was necessary before indefinite tenure could be awarded. Furthermore, Dr. Scott testified that he knew of no instance in which an initial probationary appointment was shorter than three years.

Thus, in only one instance, involving Dr. Cooke, does it appear that the University granted indefinite tenure to a faculty member upon reappointment whose previous appointment had been for less than a three-year probationary period. A single isolated instance such as this does not rise to the level of proof necessary to constitute a custom and practice. *Cf. Jacobson v. Leonard*, 406 F.Supp. 515, 521 (E.D.Pa. 1976) (isolated hiring experience insufficient to charge party with knowledge of hiring custom and practice of medical colleges), *aff'd in part, vacated in part*, 546 F.2d 417 (3d Cir.1976). In addition, Dr. Cooke did not claim that his indefinite tenure was the result of a "previous appointment," but rather that it resulted from his promotion to a position with indefinite tenure, after serving in a full-time teaching position, from lecturer to associate professor, the latter rank being one with indefinite tenure. Dr. Best makes no claim she was promoted, nor that her "previous appointment" was either full-time or a teaching position.

The custom and practice that Dr. Best had to demonstrate in order to succeed on

her previous appointment theory was the University's treatment in 1975–76 of part-time, non-teaching faculty appointments: did such appointments constitute a "previous appointment" under the Faculty Handbook. What Dr. Best showed was that there were a number of ways to obtain indefinite tenure at the University. But since she was relying on the "previous appointment" language in the Faculty Handbook, she had to show that the type of appointment she received from April 1 to June 30, 1976, was, according to the custom and practice of the University, a "previous appointment" that would entitle her upon reappointment to indefinite tenure.[7] This she did not show in the absence of some repetitive conduct by the University in treating a part-time, temporary, non-teaching, non-resident appointment as a "previous appointment" under the Faculty Handbook Section III(C)(2). Indeed, the evidence showed that Dr. Best herself was not always of the opinion that she had obtained indefinite tenure by virtue of her reappointment in July, 1976; her letters to Dean Hill and Vice President Alexis in 1979 state that she then was in the final year of her three year probationary appointment. *See Cobb v. Howard University,* 70 App.D. C. 339, 344–45 n. 21, 106 F.2d 860, 865–66 n. 21 (common knowledge that teachers

seeking academic appointments place increasing emphasis on provisions for tenure), *cert. denied,* 308 U.S. 611, 60 S.Ct. 175, 84 L.Ed. 510 (1939); *cf. Marwil v. Baker, supra,* 499 F.Supp. at 575 (written term contract and plaintiff's prior experience with appointment contracts). This position is obviously inconsistent with her "previous appointment" theory and a clear showing of custom and practice was required in order to demonstrate her reasonable expectation at the time of her negotiations with Dean Robinson. Nor, given her reliance on the Handbook provision for "previous appointment," could reliance on other extrinsic evidence specific to her appointment—such as the correspondence between Dean Robinson and herself, the appointment papers, a press release regarding her appointment as acting dean and a form recommending her appointment as departmental chair[8]—fill the void about what generally occurred at the University with regard to indefinite tenure by reason of a "previous appointment" such as the one Dr. Best held. The examples of faculty members not in her same status (either because they had indefinite tenure before coming to the University and were granted indefinite tenure under "exceptional circumstances"[9] or because they held previ-

7. It was the University's position that Dr. Best received only two simultaneous appointments and as of July 11, 1976, did not have a "previous appointment" under Section III(C)(2). Vice President Alexis testified that both of her appointments were executed on the same day and thus she was not reappointed to a regular position in the sense that someone in a regular faculty position would be reappointed; she was only given a term appointment.

8. Section II of the Faculty Handbook provides that the administrative functions of a dean are distinct from title and status as holders of academic positions. Dr. Best did not offer evidence of the University's custom and practice to appoint as acting dean only persons having indefinite tenure. Indeed, the circumstances under which she was appointed reflect an interim assignment as dean until a permanent dean could be selected; the faculty had presented a vote of no confidence to Vice President Alexis because, *inter alia,* of Dean Robinson's unilateral actions in abolishing and merging departments and his alleged irregularities in hiring faculty (including Dr. Best). Alexis and Robinson agreed that Robinson was probably moving

too fast for the faculty and that it would be best if he stepped down as dean.

Nor is the justification in the form recommending that Dr. Best be appointed departmental chairman on July 1, 1976, evidence that she had indefinite tenure. The justification stated that Dr. Best "whose term as a part-time faculty member expires on June 30, 1979 [sic], has been recommended for reappointment as a full-time professor in the department effective 7/1/76." Vice President Alexis testified that in Dr. Best's case the President of the University had waived, as he had in the past to meet University needs, the requirement that the departmental chairman be tenured. Dr. Best did not present the President's testimony but argued only that Alexis was giving an interpretation of the President's action since nothing in the document signed by the President indicated that he had waived the tenure requirement.

9. Dr. Best did not argue in the trial court that her contract awarded her indefinite tenure because of "exceptional circumstances" under the Faculty Handbook. See note 2, *supra.* In such cases, a professor would be granted indefinite

ous full-time teaching appointments for the usual probationary period) do not show custom and practice relevant to her theory, and failing to meet her burden of proof, the examples cannot be the basis for a finding by the jury in her favor.

As the District of Columbia Circuit pointed out in *Greene, supra,* "[c]ontracts . . . in and among a community of scholars, which is what a university is," "are to be read [ ] by reference to the norms of conduct and expectations founded upon them" in a particular manner, unlike, to some degree, contracts made in the ordinary course of doing business. 134 U.S.App.D.C. at 88, 412 F.2d at 1135; *see Best I, supra,* 484 A.2d at 967. The requirement for clear and satisfactory proof of the custom and practice of a University, in determining the reasonable expectations of the parties, reflects public policy concerns that indefinite tenure not occur by default. *Cusumano v. Ratchford,* 507 F.2d 980, 986 (8th Cir.1974) ("It cannot serve the public welfare or promote the best interests of the University or its professorial staff to have a body of teachers . . . the permanent tenures of whom rest upon administrative neglect or oversight. . . ."), *cert. denied,* 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46 (1975).

### III.

The University also contends that Dr. Best failed to present evidence of custom

and practice on which any reasonable jury could find that she was entitled to a three-year appointment as a result of the University's breach of her contract by late notice of the non-renewal of her appointment. The University maintains that no such evidence was presented and that under the Faculty Handbook Dr. Best was entitled only to a statement of reasons for her non-renewal. Further, the University maintains that her measure of damages is limited to the six months in which she did not receive the one year prior notice to which she was entitled under the Handbook.

The special verdict form gave the jury five options in determining the appropriate remedy for breach by reason of late notice of non-renewal.[10] The jury selected the fourth option, a three-year reappointment without indefinite tenure, and awarded Dr. Best $155,000.

### A.

■ As earlier noted, it has long been held in the District of Columbia that custom and practice must be established by "clear and satisfactory evidence." *Weaver v. DuPont, supra,* 119 A.2d at 717. See Part II, *supra.* This court has not had occasion to articulate a burden of proof standard for custom and practice, and we need not do so here.[11] The University re-

---

tenure without prior service of the normal three-year probationary period during which the University could observe the professor and evaluate teaching and other relevant skills before making a decision on whether to grant indefinite tenure. According to Vice President Alexis, indefinite tenure occurred under "exceptional circumstances" when, in rare circumstances, the University was recruiting someone from another university who already had indefinite tenure and who was notable because of excellence, research and writing, and who was needed to fill a critical void at the University.

**10.** The verdict form gave the jury the options of finding that Dr. Best was entitled, as a result of receiving late notice of nonrenewal, to: (1) a statement of reasons for nonreappointment; (2) damages for six months without indefinite tenure; (3) reappointment for one year without indefinite tenure; (4) reappointment for three years without indefinite tenure; and (5) reappointment with indefinite tenure.

**11.** Some courts have held, albeit in other contexts, that the term "clear and satisfactory evidence" is the equivalent of "clear and convincing evidence." *See, e.g., Castellano v. Bitkower,* 216 Neb. 806, 812, 346 N.W.2d 249, 253 (1984); *Snyderwine v. McGrath,* 343 Pa. 245, 251–52, 22 A.2d 644, 647 (1941); *Continental Sheep Co. v. Woodhouse,* 71 Wyo. 194, 202–03, 256 P.2d 97, 99 (1953). Still other courts have expressly stated that custom and usage must be proven by clear and convincing evidence and that a mere preponderance will not suffice. *Radio Station KFH Co. v. Musicians Ass'n, Local No. 297,* 169 Kan. 596, 602–05, 220 P.2d 199, 205–06 (1950); *Braden Winch Co. v. Surface Equip. Co.,* 196 Okla. 444, 446, 165 P.2d 640, 643 (1945) (quoting *Jarecki Mfg. Co. v. Merriam,* 104 Kan. 646, 650, 180 P. 224, 225 (1919)). *See also* S. Williston, A Treatise on the Law of Contracts § 657, at 88–89 (3d ed. 1961) (clear and convincing evidence of custom required).

quested that the jury be instructed that it must defer to the University's decisions regarding reappointment and indefinite tenure if they were not arbitary or capricious and had a rational basis.[12] It also objected to the instructions before the jury retired, and in its post-trial motion, on the same grounds. The University did not, however, object at any time in the trial court, and does not argue on appeal, that the instructions incorrectly stated Dr. Best's burden of proof to show its custom and practice. *See Mark Keshishian & Sons v. Washington Square, Inc.*, 414 A.2d 834, 843 (D.C. 1980); *Weisman v. Middleton*, 390 A.2d 996, 999–1000 (D.C.1978) (review barred absent record evidence of miscarriage of justice); Super.Ct.Civ.R. 51. Indeed, the University's proposed instructions state that Dr. Best's burden of proof on the issue of custom and practice was only a preponderance of the evidence. We conclude that Dr. Best's evidence was sufficient to satisfy the preponderance standard.

Dr. Best maintains that there was sufficient evidence from which the jury could find that under the circumstances Dr. Best could reasonably expect to receive another three-year appointment at the University after June 30, 1979. She relies on the testimony of Captain Basdekian that if notice was untimely, a new appointment would result, and on the testimony of Dr. Telang that a person would have a job if notice of non-renewal was untimely. She also relies on the testimony of Dr. Scott that an initial probationary appointment is usually for three years, and the fact that her prior appointment was for three years. Vice President Alexis also testified that probationary faculty receiving late notice of non-renewal have the expectation of reappointment and that the Faculty Handbook suggests such an expectation.

Thus the evidence was undisputed that Dr. Best had a reasonable expectation of reappointment. None of the witnesses on whom Dr. Best relies testified, however, that the appointment following late notice of non-renewal would necessarily be for the same length as the prior appointment or that it was the custom and practice of the University to reappoint for the same term as the late notice term.[13] This was, however, a reasonable inference from the evidence. The University maintained that Dr. Best had received only one regular appointment, the ninety-day appointment having been a special accommodation to Dr. Best. See note 7, *supra*. Vice President Alexis agreed that under the Faculty Handbook a person in Dr. Best's position, in the last year of a regular three-year probationary appointment, had a reasonable expectation of reappointment upon receiving late notice of nonrenewal. In describing the University's custom and practice regarding notice of nonrenewal to non-tenured faculty serving a term appointment, Dr. Alexis testified that if the faculty member had "a series of

12. The University's proposed instruction sought to narrow the scope of judicial review, and not to change the burden of proof of custom and practice. In the trial court the University relied on *McConnell v. Howard University*, 621 F.Supp. 327 (D.D.C.1985). There the district judge granted summary judgment to the University in a suit for breach of contract brought by a tenured professor who had been dismissed. The professor, after exhausting his administrative remedies under the Faculty Handbook, argued that the University lacked adequate "cause" to dismiss him and urged the court to disregard the results of his administrative review by the University and to determine *de novo* whether the professor had neglected his duties. The judge declined to do so, stating "the Court should uphold the [University's] decision ... unless [it] was arbitrary, or plaintiff has proferred evidence of improper motivation or irrational action." 621 F.Supp. at 331. The Court of Appeals rejected the district court's formulation of the standard of judicial review for university contract claims. *McConnell v. Howard University*, 260 U.S.App.D.C. 192, 203–04, 818 F.2d 58, 69–70 (1987). *See also id.* at 204, 818 F.2d at 70 (preponderance of the evidence applies in determining "cause" for dismissal in breach of contract claim) (quoting Byse & Joughin, *Tenure in American Higher Education: "Specific Conclusions and Recommendations,"* reprinted in ACADEMIC FREEDOM AND TENURE 210, 214 (L. Joughin ed. 1069)).

13. Dr. Best's reliance on *Knipp v. Harris*, 45 App.D.C. 460 (1916) (employee untimely notified of non-retention entitled to reappointment for an equal term) is misplaced since the commercial employment contract in that case provided the contract would continue in effect from year to year.

two-year appointments," he or she would have been at the University for six years, and that twelve months before the final, seventh, year an individual had to receive notice of whether or not there would be a favorable tenure recommendation. The evidence regarding a seven-year probationary period and the standard three-year probationary period, combined with Dr. Best's appointment papers showing a three-year term appointment, provided the quantum of evidence required for the jury reasonably to find that it was more likely than not that Dr. Best was entitled to a second three-year appointment when she did not receive timely notice of the nonrenewal of·her term appointment.[14] No testimony was offered that the University's custom and practice upon late notice of nonrenewal was either a six-month or one-year reappointment; the verdict form did not give the jury the option of choosing a two-year or four-year reappointment. The trial court submitted a verdict form to the jury which contained the alternative for a three-year appointment that the University had requested in its proposed instructions. The court's instructions to the jury on its options in selecting a remedy under Dr. Best's late notice theory were those requested by the University, and the University did not object to the submission of that alternative to the jury after all the evidence was presented or to the court's instructions.

### B.

■ The University's other claims of error come too late. Its objections to evidence on the ground of hearsay addressed testimony relating to Dr. Best's claim that she was entitled to indefinite tenure as a result of late notice and not the testimony that she was entitled to another term appointment upon late notice of nonrenewal. *Alston v. United States*, 509 A.2d 1129, 1131 n. 9 (D.C.1986) (hearsay evidence admitted without objection may properly be considered by trier-of-fact and given its full probative value); *Carmon v. United States*, 498 A.2d 580, 583 n. 5 (D.C.1986); *Eldridge v. United States*, 492 A.2d 879, 883 (D.C.1985). In any event, the University's own witness, the Vice President for Health Affairs, provided key testimony about the University's custom and practice of reappointment upon late notice. The University is hardly in a position to complain that the jury relied on Vice President Alexis' testimony and the University's appointment papers for Dr. Best in deciding among the options presented to it in the verdict form.

The University also argues that it made a timely objection to Dr. Henry's testimony about Dr. Best's suffering a heart attack while she was in California. Even if we were to agree with the University, contrary to the trial court's finding, that its objection was timely, since it was made eleven words after the objectionable statement, *see Pyne v. Jamaica Nutrition Holdings Ltd.*, 497 A.2d 118, 129 (D.C.1985) (quoting MCCORMICK ON EVIDENCE § 55, at 143 (E. Cleary ed. 1984)), our disposition does not require that we consider the implications of the trial court's statement that Dr. Henry's testimony was "terribly damaging" and could not be eradicated from the trial. See Part IV, *infra*.

■ Similarly, the University's mathematical objections to the amount of the jury award come too late,[15] and in any

---

14. The trial court instructed the jury that Dr. Best had the burden "to prove [the University's] customs and practices by a preponderance of the evidence to justify her claimed expectation of continued employment and tenure." As defined for the jury by the court, Dr. Best had to establish that "something is more likely than not", to show "the probability of truth" in her favor, "to tip [the scales of justice] ever so slightly" in her favor. Notwithstanding the language of *Best I, supra*, 484 A.2d at 973–74, 976, no instruction was requested or given on the nature of the custom and practice that had to be established. *Cf. Levensaler, supra*, 53 App.D.C.

at 327, 290 F. at 303 (instruction should inform jury of facts or circumstances as would warrant knowledge of the custom).

15. The University also argued that the verdict was inconsistent with Dr. Best's expert's report that from 1979 to 1982 she was entitled to $125,379, and the jury instruction that Dr. Best was required to mitigate her damages. Since she earned $51,000 during those years, the verdict, according to the University, should have been $74,379, and the University therefore is entitled to a remittitur. Dr. Best responds that the University failed to ask for this relief from

event, they are not well founded. The amounts relied on by the University in its mathematical argument fail to include nineteen percent fringe benefits, the present value calculations (minus actual earnings by Dr. Best), and the "add on" for the differential tax rates. Thus, the trial court did not err in denying a remittitur on the alternative verdict.

## IV.

 Finally, the University maintains that the trial court abused its discretion in denying the motion for a new trial. *Rich v. District of Columbia,* 410 A.2d 528, 535 (D.C.1979). The University argued that it was denied a fair trial because of Dr. Best's appearance and actions before the jury.[16] In view of our disposition we need only consider whether the trial court erred in refusing to grant a new trial on the alternative verdict. Since critical testimony in support of that verdict was offered by the ranking official from the University who testified at trial and the dollar amount of the verdict is a mathematical calculation based on nondiscretionary amounts to which Dr. Best was entitled for a reappointment for three years, we are unpersuaded that the jury was likely to have been affected in reaching its decision on the alternative verdict by Dr. Best's actions. Those actions may have been regrettable, particularly in view of the trial court's admonition that she not display her medication to the jury. However, when the trial court denied the University's motion for a mistrial, the trial court was well aware that it had found, before the case

was submitted to the jury, that the jury could not see Dr. Best's medicine fall from her hand in front of the jury box as she left the witness stand. The court observed further that it was unclear whether the jury had seen the hospital identification bracelet on Dr. Best's left arm. The University does not suggest that either of these findings was clearly erroneous. Although the specter of sympathy was present, the record on appeal does not suggest a clear abuse of discretion by the trial court. *Pyne v. Jamaica Nutrition Holdings Ltd., supra,* 497 A.2d at 126; *Johnson v. Bernard,* 388 A.2d 490, 491 (D.C.1978); *Luck v. Baltimore & O. Ry.,* 166 U.S.App.D.C. 283, 288, 510 F.2d 663, 668 (1974); 6A J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE § 59.08[5] (1987).[17]

Accordingly, we reverse the judgment based on the verdict finding that Dr. Best was entitled to indefinite tenure, and we remand the case with instructions to enter a judgment based on the alternative verdict finding that Dr. Best was entitled to a new three-year term appointment and $155,000 in damages.

the trial court and cannot do so now, and that, in any event, the University is incorrect. The University argued in its motion for judgment notwithstanding the verdict or remittitur that the "findings" in support of the alternative verdict of $155,000 were "not supported by any evidence whatsoever" and that she was entitled only to six months damages; it did not address mitigation or the mathematical error in its motion. Hence it is barred from raising such claims for the first time on appeal. *Chase v. Gilbert,* 499 A.2d 1203, 1209 & n. 7 (D.C.1985).

16. During the trial Dr. Best became ill, and following a brief hospital stay she reappeared at trial to testify in rebuttal. At the time she looked pale and appeared to be in a weakened

condition. When she was leaving the witness stand, she walked in front of the jury box, and while holding on to the railing with her left hand, on which she wore a hospital identification bracelet, she dropped her medicine on the floor in front of the jury box.

17. Had we rejected the University's contentions regarding Dr. Best's proof of custom and practice in support of her "previous appointment" theory of indefinite tenure, a more difficult question would be presented in view of the prior verdicts, both of which were substantially lower than the verdict in the instant case, and the first trial court's grant of a motion for a new trial on damages. *Best I, supra,* 484 A.2d at 965.